**LABORERS PENSION TRUST FUND—DETROIT AND VICINITY, Laborers Vacation and Holiday Trust Fund—Detroit and Vicinity, Laborers Metropolitan Detroit Health and Welfare Fund, Laborers Annuity Fund—Detroit and Vicinity, and Michigan Laborers' Training Fund, Plaintiffs,**

v.

**INTERIOR EXTERIOR SPECIALISTS CONSTRUCTION GROUP, INC., Interior Exterior Specialists Contractors, Inc., Interior Exterior Specialists Company, Llamas Group Construction, Inc., Llamas Group Development, Inc., Llamas Group Corp., Defendants.**

No. 04–74514.

United States District Court,
E.D. Michigan,
Southern Division.

March 21, 2007.

George H. Kruszewski, Robert A. Farr, Jr., Rolland R. O'Hare, Sachs Waldman, Detroit, MI, for Plaintiffs.

Steven A. Wright, Shelby Township, MI, for Defendants.

### *OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT*

LAWSON, District Judge.

The plaintiffs commenced this action pursuant to the Employee Retirement and Income Security Act of 1974 to collect payments for fringe benefits claimed due for the years 2000 through 2005 under a collective bargaining agreement. The defendants include the signatory to an opt-in agreement under the CBA and other entities that the plaintiffs allege are *alter egos* of the signatory. The contested issues presented by the cross motions for partial summary judgment are whether there are any disputed facts creating a trial issue on the liability of the other entities under an *alter ego* theory, and whether the signatory effectively terminated its participation in the CBA after 2003 (the latter issue, the plaintiffs contend, the defendants cannot even raise). The Court finds that the plaintiffs have failed to come forward with facts to support their *alter ego* theory of liability as to all but one of the other entities, defendant Interior Exterior Specialists Construction Group, Inc. may raise the issue whether it successfully overrode the "evergreen clause" in the opt-in agree-ment and terminated the CBA, and Interior Exterior Specialists Construction Group, Inc. has not made the requisite showing to support its contention that its participation in the CBA was terminated in 2003. The Court therefore will grant in part and deny in part the defendants' motion for partial summary judgment and grant the plaintiffs' motion.

I.

The plaintiffs are trust funds established and administered pursuant to the Labor Management Relations Act of 1947 (LMRA) and the Employee Retirement Income Security Act of 1974 (ERISA). As noted, they have brought suit alleging that the defendants failed to make contributions to the fringe benefit programs administered by the plaintiffs for the benefit of employees represented by Locals 334, 1076 and 1191 of the Laborers International Union of North America, AFL–CIO. Presently, the dispute involves contributions allegedly due Local 334 workers; the plaintiffs no longer are pursuing collections involving the other locals.

Defendant Interior Exterior Specialists Co. (IES) is a Michigan corporation that was incorporated on July 31, 1997 by Rito J. Llamas, who also is the president and sole shareholder of that company. Defendant The Llamas Group, Corp. (TLG) is a Michigan corporation incorporated on March 30, 1999 by Julie M. Llamas, Rito's wife. The other defendants to this action, Interior Exterior Specialists Contractors, Inc. (IES2), Interior Exterior Specialists Construction Group, Inc. (IES3), The Llamas Group Construction, Inc. (TLG2), and The Llamas Group Development, Inc. ("TLG3"), were all incorporated on September 17, 2003. IES2 and IES3 were incorporated by Rito Llamas; TLG2 and TLG3 were incorporated by Julie Llamas.

The first CBA involving the union locals and IES was the contract covering 1997 through 2000. IES was not a signatory to the original CBA, but on April 20, 1999, IES signed an agreement to opt in to the CBA, which had been negotiated between the Associated General Contractors (AGC), the Laborers District Council, and Local 1076. On April 6, 2000, IES signed onto the CBA with Local 334. There is no agreement between the parties as to which version of the CBA IES originally opted into; the plaintiffs contend that it was the 1997–2000 version, while IES maintains it was the 2000–2003 version. This dispute is not material, however, because all parties agree that IES was bound by the 2000–2003 contract with Local 334.

The opt-in agreement signed by IES governing its relationship with Local 334 contains the following provisions concerning the giving of notices and automatic renewal of the opt-in-agreement (the evergreen provision):

CONTRACT TO BE EXECUTED BETWEEN AN EMPLOYER WHO IS NOT A MEMBER OF THE SIGNATORY GROUPS COVERED BY THIS AGREEMENT.

. . . .

The [undersigned] Employer agrees to adopt the foregoing agreement, to be bound by all the terms and conditions of the Agreement and amendments thereto, including the effective dates, and to become a party thereto. It is also agreed by the undersigned Employer that any notice given by the Union to the Association pursuant to Article XXXIII of the Agreement shall be notice to the Employer and shall have the same legal force and effect as though it were served on the Employer personally.

Finally, the Employer agrees that, unless the Union is notified to the contrary by the Employer by registered mail at least sixty (60) days prior to the expiration date of this Agreement or any subsequent Agreement, the Employer will be bound by and adopt any Agreement reached by the Union and the Association during negotiations which follow notice by the Union referred to in the preceding paragraph.

Defs.' Mot. for Summ. J., Ex. 3, Local 334 CBA; Pltfs.' Resp. Brf., Ex. B, Local 334 CBA. Appearing below this language are the signatures of Rito J. Llamas on behalf of IES and Percy Roberson on behalf of Local 334. The 2000–2003 CBA expired on May 31, 2003. It is undisputed that none of the TLG entities nor IES2 nor IES3 was a party to this CBA.

On February 14, 2000, Rito J. Llamas sent a letter to Local 1076 on behalf of IES explicitly terminating the CBA with that local. The letter reads as follows:

The purpose of this correspondence is to notify you of the termination of our membership. Interior Exterior Specialist will *not* be resigning a contract with Laborers' Local Union 1076 when our current contract expires this year.

*Ibid.* It is undisputed that this letter effectively terminated IES's obligations vis-à-vis Local 1076.

On March 28, 2003, roughly sixty-four days before the 2000–2003 CBA with Local 334 was set to expire, Rito Llamas sent a letter to Scott Covington, Business Manager of Local 334. Unlike the letter sent three years earlier to Local 1076 unequivocally terminating the CBA, the March 2003 letter stated:

Please be advised that if the contract is not negotiated to our satisfaction before the expiration date of the 2000 to 2003 contract, we will not be renewing our contract with Local 334.

Pltfs.' Resp. Brf., Ex. D, Local 1076 Termination Letter.

Also on March 28, 2003, Rito Llamas sent another letter to Scott Covington regarding IES's desire to negotiate changes to the CBA. In that letter, Mr. Llamas informed Mr. Covington as follows:

Please be advised that Interior Exterior Specialist is hereby giving notice, in accordance with Article XXXIII, "Changes", of the 2000–2003 Laborers Agreement, of its desire to negotiate changes in the Agreement.

I will contact you in the near future to schedule a meeting for this purpose.

Defs.' Resp. Brf., Ex. 6, Letter to Local 334 re Negotiations.

Local 334, AGC, and the Laborers District Council subsequently negotiated successor CBAs covering 2003 through 2006 and 2006 through 2009, respectively. It is undisputed that none of the defendants formally signed these agreements.

Beginning in January 2004, and pursuant to their theory that IES and the other defendants were still parties to a CBA with Local 334, the plaintiffs attempted to audit the defendants to determine the amount of monies owed and unpaid under the CBA's fringe benefit contribution provisions. When this attempt failed, the plaintiffs filed the present action on November 18, 2004 requesting an order allowing an audit and judgment in the amount of the determined deficiency. The Court ordered an audit of the defendants, and on May 19, 2005 the plaintiffs released their audit. The auditor, Kem Whately, found IES, IES2, and IES3 to jointly owe (presumably on an *alter ego* theory as to the latter two entities) $852,911 in fringe benefit contributions. Mr. Whatley found TLG, TLG2, and TLG3 to jointly owe (again presumably on an *alter ego* theory) $584,460.39 in fringe benefit contributions. The time periods covered by the audit range from January 2000 through April 2005 with respect to IES, IES2, and IES3 and January 2000 through December 2004 with respect to TLG, TLG2, and TLG3. Despite the figures reported by Mr. Whatley, which add up to over $1,437,000, the parties subsequently submitted a joint report wherein, according to the defendants, the plaintiffs claim they are owed only $240,254.79.

On March 24, 2006, Rito J. Llamas sent Scott Covington a letter stating that

Interior Exterior Specialist will not be renewing its contract with Local 334 upon expiration of the contract term on May 31, 2006.

This termination notice in no way implies that Interior Exterior Specialist deems itself signatory to the 2003–2006 contract. Interior Exterior Specialist continues to maintain that they properly withdrew from the 2003–2006 contract.

Defs.' Resp. Brf., Ex, 11, Letter from Llamas to Covington dated March 24, 2006.

In support of their motion for summary judgment, the defendants have submitted the affidavits of Rito J. Llamas and Forest A. Henry, Director of Labor Relations for the Construction Association of Michigan (CAM). In his affidavit, Mr. Llamas averred that

3. Between the time that IES entered into a collective bargaining agreement ("CBA") with Local 334 and IES's termination as of May 31, 2003, IES contributed approximately $283,172.39 to the Fund.

4. After terminating the CBA, IES contributed approximately $302,376.79 to the Fund, pursuant to multiple Project Labor Agreements.

Defs.' Mot. for Summ. J., Ex. 14, Aff. of Rito J. Llamas. Attached to Mr. Llamas's

affidavit is a summary of the contributions IES allegedly made to the plaintiff funds.

Forest Henry stated in his affidavit that

3. On or about March 3, 2003, Rito Llamas, President of the Interior/Exterior Specialist Co. ("IES") executed a Power of Attorney authorizing CAM to negotiate and execute a Collective Bargaining Agreement ("CBA") with the Local 334 of the Laborers Union ("Local 334") on behalf of IES.

4. On or about June 1, 2003, acting in my official capacity as a representative of CAM, I executed a CBA with Local 334 on behalf of multiple employers for which CAM did have authority to negotiate and execute a CBA.

5. Because IES had already expressed its unwillingness to continue to be bound by a CBA with Local 334 as evidenced by IES's letter dated March 28, 2003 to Local 334, at the time that CAM entered into this CBA with Local 334, neither CAM nor I retained any authority or assent to enter into such an agreement on behalf of IES.

Defs.' Mot. for Summ. J., Ex. 5, Aff. of Forest Henry.

In their brief in opposition to the defendants' motion for partial summary judgment, the plaintiffs refer to an exhibit previously submitted to the Court in connection with an earlier motion. The referenced exhibit contains copies of paycheck stubs for a number of workers employed by IES and TLG from 2000 through 2003. The plaintiffs have referred to this exhibit to advance their *alter ego* theory, alleging that the paycheck stubs demonstrate that "[e]mployees would work forty hours in a one-week period, or 80 hours in a two-week pay period, for IES and then be given paychecks from TLG for the remainder of the pay period to avoid the payment of overtime and additional fringe benefit contributions." Pltfs.' Resp. Brf. at 8.

On August 24, 2006, the defendants filed the present motion for partial summary judgment alleging that they are entitled to a determination as a matter of law that IES2, IES3, TLG, TLG2, and TLG3 are not and never were the alter egos of IES and that IES terminated its obligations under the CBA with Local 334 as of May 31, 2003. Thereafter, the case was transferred to this Court's docket. On October 26, 2006, the plaintiffs filed their cross-motion for partial summary judgment asking the Court to rule that IES's participation in the CBA with Local 334 was not terminated through the end of the 2003–2006 contract period. The Court heard oral argument on the motions on January 25, 2007.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The parties have filed cross motions for summary judgment, which might imply that there are no facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding such cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir.2003). Therefore, when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506 (6th Cir.2003).

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the "'record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,'" there is no genuine issue of material fact. *Simmons–Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir.2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir.2003).

### A.

The defendants argue that their liability for benefit contributions for Local 334 members cannot extend beyond May 31, 2003 because they successfully overrode the evergreen clause in the opt-in agreement by notifying the Union of their desire to negotiate changes in the successor agreement. The plaintiffs contend that this defense is not available to the defendants because it is barred by section 515 of ERISA.

■ Congress enacted section 515 of ERISA to permit multiemployer plans to collect past-due contributions from employers in federal court. *Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller General Masonry Contracting Co.*, 157 F.3d 404, 407 (5th Cir.1998). Section 515 simply states:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

In the cases of *Northwestern Ohio Administrators, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018 (6th Cir.2001), and *Bakery and Confectionery Union and Industry International Health Benefits and Pension Funds v. New Bakery Company of Ohio*, 133 F.3d 955 (6th Cir.1998), the Sixth Circuit held that pension trust funds proceeding under section 515 are insulated from many potential defenses. The *Walcher & Fox* court described the "well-established precedent that ERISA funds are accorded a special status and are entitled to enforce the writing, regardless of what defenses may be available under the common law of contracts." *Walcher & Fox*, 270 F.3d at 1025. Similarly, in *New Bakery*, the court of appeals explained:

> Congress enacted section 515 in order to permit multiemployer plans to rely upon the terms of collective bargaining agreements and plans as written, thus permitting trustees of plans to recover delinquent contributions efficaciously, and

without regard to issues which might arise under labor-management relations law.... Because, under section 515, multiemployer plans are entitled to rely on the literal terms of written commitments between the plan, the employer, and the union, the actual intent and understanding between the contracting parties are immaterial.... The fund thus stands much like a holder in due course in commercial law who is entitled to enforce the writing without regard to understandings or defenses applicable to the original parties.... By allowing multiemployer funds to enforce the literal terms of an employer's commitment, section 515 increases the reliability of their income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements.

*Id.* at 959 (internal quotes, alterations, and citations omitted). Following these principles, the court in *Walcher & Fox* held it no defense to a section 515 action that an employer and a union had attempted to modify the provisions of a CBA when the alleged modifications were only evidenced by ambiguous handwritten notations next to unambiguous typed provisions in the CBA, stating: "The law of this circuit does not require fund administrators to read the minds of contracting parties; rather, administrators may rely on the unambiguous terms of the writing.... Without more, these notations do not indicate an intent to supercede the unambiguous typed provisions." *Walcher & Fox*, 270 F.3d at 1025

The Ninth Circuit has taken this argument one step further and held in *Carpenters Health & Welfare Trust Fund v. Bla–Delco*, 8 F.3d 1365 (9th Cir.1993), that unless the agreement between the employer and the union is void because of fraud or illegality, section 515 bars any defense based on the claim that the agreement is voidable. In that case, the court determined that an employer could not interpose the claim that it had terminated its opt-in agreement with the union as a defense to an ERISA collection by the pension trust fund. The employer had sent a letter to the union stating that it had no desire to renew its agreement with the union under a CBA, but the union rejected that letter as untimely. In rejecting that defense, the court stated:

In this case, Bla–Delco [the employer] does not contend that the CBA never existed because of fraud or illegality. The CBA was a valid contract and Bla–Delco was bound by its terms to pay contributions to the Trust Funds. The dispute centers on whether Bla–Delco effectively terminated the CBA. Consequently, the CBA was not "void," but merely "voidable," and therefore Bla–Delco's purported termination of the CBA is not a legitimate defense to the Trust Funds' action. *See [Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769] at 775 [(9th Cir.1986)].

. . . .

It would contravene the policy to simplify and expedite trust fund collection actions to require the Trust Funds' [sic] in this case to litigate the termination dispute between Bla–Delco and the Union.

*Id.* at 1369.

The Fifth Circuit has staked out a more moderate position on cases in which the employer claims to have terminated its relationship under a CBA. In *Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller General Masonry Contracting Co.*, 157 F.3d 404 (5th Cir.1998), the court rejected *Bla–Delco's* holding that barred a defense of contract termination altogether. In that case, the employer's termination let-

ter informed the union that " '[f]or the immediate future we will continue to make contributions to our local benefit funds. . . . If there is a change in our position, we will notify you in another letter.' " *Id.* at 406. A month later, and without further notification, the employer stopped making contributions. The court held that the termination defense was valid because it went to the heart of the question whether a contract existed at all. But section 515 was enacted to relieve pension trust funds from becoming embroiled in protracted litigation in order to collect benefit contributions, and therefore there was some limitation in the manner that defense could be presented. Therefore, the court explained:

> Although a district court may consider the significance of a purported termination, the court's examination must end following a superficial inquiry into the termination's effect. Thus, a court may determine whether an attempted termination was timely or not. *Cf. Bla–Delco Constr.*, 8 F.3d at 1369. Further, a court may review an alleged termination to determine if the requisite intent has been conveyed. *Cf. OPEIU Local 42 v. UAW, Westside Local 174*, 524 F.2d 1316, 1317 (6th Cir.1975). However, if the issue of termination cannot be resolved through cursory review, the defense to a section 515 action will not succeed.

*Id.* at 409 n. 12. Engaging in this "cursory review" of the effect of the termination letter, the *Alfred Miller* court found the letter to be ineffectual for two reasons: (1) it did not "unequivocally indicate[ ] an intention to terminate the CBA"; and (2) it was untimely. *Id.* at 409.

 The Sixth Circuit has not issued a published opinion on this issue, although there is a non-published opinion that addresses this very issue in *Plumbers &*

*Pipefitters Local Union No. 572 Health & Welfare Fund v. A & H Mechanical Contractors, Inc.*, 100 Fed.Appx. 396 (6th Cir. June 1, 2004). There, the court affirmed the district court's adoption of the employer's termination defense based on a letter to the union local that read in its entirety: "A–H Mechanical Contractors, Inc., hereby withdraws its affiliation with the [Association] and will no longer be bound by any collective bargaining agreement entered into by that historical bargaining group." *Id.* at 398 (alteration in original). The contract in issue contained an evergreen clause, and the court believed that the employer clearly had expressed its intent to terminate the contract, which was binding on the pension fund as a third-party beneficiary. On the question of whether section 515 of ERISA barred the defense altogether, the court seemed to endorse the Fifth Circuit's approach expressed in *Alfred Miller*. The court stated:

> In view of these realities of plan management, courts have permitted defendants in these actions to raise only a few discrete "defenses": (1) illegality of the original contract; (2) arguments that the contract was void at its inception (e.g., by fraud in the execution); and (3) decertification of the union. *See Alfred Miller Gen. Masonry*, 157 F.3d at 408; *Agathos [v. Starlite Motel]*, 977 F.2d [1500,] 1505 [(3d Cir.1992)]. In addition, employee benefit funds "are not entitled to enforce a *nonexistent* contractual obligation." *De Vito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994) (quotation and citation omitted) (emphasis added); *see also Alfred Miller Gen. Masonry*, 157 F.3d at 409 & n. 12 (stating that a district court may consider "the significance of a purported termination" of the collective bargaining agreement in a § 515 action, provided the inquiry is "superficial").

A–H's termination-of-the-contract contention fits comfortably within these exceptions to the general rule against asserting contract defenses in an ERISA § 515 action. Instead of a precluded contract "defense," A–H's termination argument goes to the question whether a contractual promise to contribute exists in the first instance. . . . Section 515 after all was designed only to preclude "complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions." *[Central States, Southeast and Southwest Areas Pension Fund v.] Gerber Truck,* 870 F.2d [1148,] 1153 [(7th Cir.1989)] (quotation omitted) (emphasis added). A–H's claim that it terminated the relevant agreement obligations is hardly "unrelated" to its alleged promise to make contributions on behalf of its employees.

In response to this conclusion, the Funds argue that we should follow *Carpenters Health & Welfare Trust Fund v. Bla–Delco Constr., Inc.,* 8 F.3d 1365, 1369 (9th Cir.1993), which held that a party's "purported termination of the [collective bargaining agreement] is not a legitimate defense to the Trust Funds' action." . . . [T]he Fifth Circuit sensibly has concluded that *Bla–Delco* does not make sense as applied to termination disputes that require only a cursory review of the parties' actions. *See Alfred Miller Gen. Masonry,* 157 F.3d at 409 n. 12 (noting that a court may consider a purported termination provided that its inquiry into the effectiveness of the termination is merely "superficial"). The inability to consider a compelling termination defense, the Fifth Circuit concluded, would eviscerate the requirement that a contractual obligation exist in the first instance. *Id.* In our view, the Fifth Circuit's decision sensibly balances the competing interests in avoiding complex litigation that starves a fund's necessary contributions and ensuring that the employer has a legitimate contractual obligation to make employee contributions.

*Id.* at 402–03.

It appears, then, that the court sanctioned the termination defense in section 515 actions, although consideration of it is limited to the "cursory review" and "superficial inquiry" laid out by the *Alfred Miller* court. In order to permit the conclusion that an employer had terminated its relationship with a union local, the documents themselves must demonstrate that the termination was both timely and unequivocal. Otherwise, any ambiguity would require parol evidence for resolution, and the ensuing trial would thrust the pension trust into the "complex litigation" section 515 was intended to avoid.

■ In this case, the opt-in contract signed by IES stated that "unless the Union is notified to the contrary by the Employer by registered mail at least sixty (60) days prior to the expiration date of this Agreement or any subsequent Agreement, the Employer will be bound by and adopt any Agreement reached by the Union and the Association." Defs.' Mot. for Summ. J., Ex. 3, Local 334 CBA. Rito Llamas's March 28, 2003 letter to Local 334 was sent more than sixty days before the May 31, 2003 contract termination date, and it plainly was timely. However, the letter cannot be viewed as an unequivocal withdrawal from the contract. It reads:

Please be advised that if the contract is not negotiated to our satisfaction before the expiration date of the 2000 to 2003 contract, we will not be renewing our contract with Local 334.

Defs.' Mot. for Summ. J., Ex. 4, Letter to Local 334 re Renewal. At oral argument, counsel for IES characterized this letter as

an "absolute contingent" letter of termination. In other words, he argued that the letter was self-executing: if a new CBA was not negotiated to IES's satisfaction, IES's contractual obligations terminated pursuant to the letter's terms. The defendants maintain that this letter, when read in conjunction with another letter expressing its desire to negotiate changes to the CBA, clearly constitutes a notification "to the contrary" that IES did not intend to be bound to any new agreement. The Court does not agree.

■ Generally speaking, "[a] notice to terminate must be clear and explicit.... A notice of modification is not a notice of termination and does not affect termination of the contract." *Chattanooga Mailers Union Local No. 92 v. Chattanooga News–Free Press Co.*, 524 F.2d 1305, 1312 (6th Cir.1975) (internal quotation marks omitted), *overruled on other grounds Bacashihua v. United States Postal Serv.*, 859 F.2d 402, 404 (6th Cir. 1988). Generously read, the March 28 letter can be characterized as expressing IES's strong desire to negotiate changes in successor agreements, and nothing more. In its letters, IES certainly did not express a clear intent to terminate its status as party to the CBA. Rather, a more literal interpretation is that the letters simply informed the union that IES desired changes to the contract and if the changes were not secured, IES would *then* terminate its obligations under the CBA.

The defendants are entitled to raise their contract termination defense. But a superficial inquiry does not lead the Court to the conclusion that a termination was effectuated. The confluence of the ambiguity in the letters and the limitations upon such defense imposed by section 515 of ERISA as approved by the *A&H* court prevents the defendants' success on this ground. Partial summary judgment in favor of the plaintiffs is warranted on this record. The defendants are bound through the end of the 2003–2006 contract with Local 334.

## B.

*Which* defendants are bound under the contract cannot be determined without addressing the plaintiffs' *alter ego* theory, which the defendants challenge as well. The defendants contend the *alter ego* doctrine is inapplicable to the present situation because: (1) there is no evidence that any of the defendants intended or attempted to evade pre-existing contractual obligation; and (2) defendant IES has fulfilled all of its obligations under the CBA. In support of this argument, the defendants rely heavily on *Trustees of Resilient Floor Decorators Ins. Fund v. A&M Installations, Inc.*, 395 F.3d 244 (6th Cir.2005), and *Cement Masons' Pension Trust–Fund v. McCarthy*, 2006 WL 770444 (E.D.Mich. March 24, 2006). They say that these cases stand for the proposition that the alter ego doctrine is inapplicable in the labor context unless there is evidence that (a) the employer formed or operated the subject entity with the intent to evade preexisting CBA obligations, or (b) the relationship between the employer and the subject entity caused the trust fund to receive less than it bargained for under the CBA. Since TLG was incorporated and operational more than a year before IES became obligated under the CBA, the defendants reason, it cannot be considered IES's *alter ego*.

The plaintiffs counter with the argument that there is substantial evidence tending to show that the defendants are using TLG to avoid their obligations under the CBA signed by IES. They also rely on *Resilient Floor* and contend that the case supports their position.

The Court agrees that *Trustees of the Resilient Floor Decorators Ins. Fund v. A&M Installations, Inc.,* 395 F.3d 244 (6th Cir.2005), is the leading case in this jurisdiction on the *alter ego* issue, and, as the parties acknowledge, it is highly relevant to the present matter. In that case, the two employers were in the carpet business, the non-union company selling the product and the union company installing it. The latter, of course, was obliged to pay fringe benefit contributions into a multiemployer fund but the former was not. The pension fund argued that the union employer allowed its non-union counterpart to capitalize on union contracts, and therefore a contribution must be figured on the basis of all the workers, but the Sixth Circuit rejected that reasoning.

■ The court began its analysis by observing that the *alter ego* doctrine typically is applied in the circumstance of a successor employer who steps into the shoes of a predecessor that was obligated to pay union benefits, which ought not be avoided by the mere expedient of changing the corporate form. But the doctrine is not limited to circumstances when the non-union employer comes into existence *after* the union company. The court observed that "[o]ur own circuit has suggested in dicta that the alter ego doctrine might also be 'applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form.'" *Id.* at 248 (quoting *NLRB v. Fullerton Transfer & Storage Ltd., Inc.,* 910 F.2d 331, 336 & n. 7 (6th Cir.1990)). The key component to the application of the doctrine in the union setting is "an intent to evade preexisting obligations." *Ibid.* The court held:

> In the absence of some "indication that the relationship between [the companies] has changed over the years or has

cause the [union] to receive less than that for which it bargained," there is no inequity that would justify a court's imposition of liability.

*Ibid.* (quoting *Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.,* 343 F.3d 18, 22 (1st Cir.2003)).

In the present case, IES was incorporated in 1997. It became "unionized" in April of 1999 by signing an opt-in agreement to a CBA with Local 1076 on April 20, 1999 and signing an opt-in agreement with Local 334 on April 6, 2000. On March 20, 1999, TLG was formed. The other defendants, IES2, IES3, TLG2, and TLG3, were all formed on September 17, 2003. Formation of these entities therefore occurred well after IES purports to have terminated its obligations under the Local 334 CBA (on May 31, 2003). By all accounts, none of the defendants other than IES were unionized.

■ Focusing for a moment on TLG, the plaintiffs allege that IES and TLG shared the same employees and artificially categorized the hours they worked for each company in a way that enabled IES to avoid making all of the fringe-benefit contributions it would otherwise have had to make in the absence of TLG. The plaintiffs contend IES and TLG arranged employees' hours so that overtime hours actually worked for IES would appear as hours worked for TLG; this way, IES would not have to make union contributions in connection with overtime hours. The plaintiffs have offered pay stubs that they claim demonstrate that employees would work forty hours in a one-week pay period (or eighty hours in a two-week period) for IES and then be given paychecks from TLG for the remainder of the pay period so that IES would not have to pay overtime and the accompanying additional fringe benefits.

The defendants contend these workers were hired by TLG to work on TLG projects that were entirely separate from any IES projects. In addition, the defendants point to the fact that IES has subcontracted with TLG to provide work on TLG projects, but TLG has never subcontracted with IES to provide work on IES projects. IES says it paid fringe benefit contributions with respect to the work its employees did on TLG projects, so the pension trust funds have received more, not less, money on account of the relationship between IES and TLG.

Based on the evidence in the record, a reasonable fact finder could conclude that Rito and Julie Llamas, knowing that IES would soon become unionized, decided to form TLG as a non-union entity for the purpose of assisting IES in evading some of its union obligations. Although this inference might be quite weak in the absence of other evidence, it is bolstered by the apportionment of work hours documented in the paycheck stubs and the fact that TLG and IES share the same employees. Although the plaintiffs have not demonstrated a "pervasive intermingling of funds and operations" between TLG and IES, *see Resilient Floor*, 395 F.3d at 248, there is not such a dearth of evidence on this point as to entitle the defendants to judgment as a matter of law with respect to TLG.

■ A different result is required as to IES2, IES3, TLG2, and TLG3. These entities were created in September of 2003, three-and-one-half months after IES says it terminated its contractual obligations vis-à-vis Local 334. There is no evidence of common employees, no documentation that showing an attempt to manipulate hours, and no proof that these entities worked on common projects with IES or TLG. Moreover, the plaintiffs have not articulated any rebuttal argument in their response brief that suggests an evidentiary basis for concluding that IES2, IES3, TLG2, and TLG3 were used in any way to help IES avoid its union obligations. In fact, the plaintiffs do not even address the applicability of the *alter ego* doctrine to these other defendants. The plaintiffs have not offered any evidence to suggest that these defendants were indeed the alter egos of IES beyond the mere fact that IES2 and IES3 were formed by Rito J. Llamas and TLG2 and TLG3 were formed by Julie Llamas. A reasonable fact finder could not conclude that these entities are or were the *alter egos* of IES based on the evidence in the record.

### III.

The Court finds that the defendants have not furnished sufficient proof that IES effectively terminated the automatically-renewing opt-in agreement prior to the end of the 2003–2006 CBA, fact issues preclude a determination as a matter of law that TLG was not the *alter ego* of IES for a portion of the fringe benefits provisions of the CBA, and there is no evidence that IES2, IES3, TLG2, and TLG3 were the *alter egos* of IES.

Accordingly, it is **ORDERED** that the plaintiffs' motion for partial summary judgment [dkt # 94] is **GRANTED.**

It is further **ORDERED** that the defendants' motion for partial summary judgment [dkt # 79] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE** as to defendants Interior Exterior Specialists Contractors, Inc., Interior Exterior Specialists Construction Group, Inc., The Llamas Group Construction, Inc., and The Llamas Group Development, Inc., only.