**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0595n.06

**No. 08-2526**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

LABORERS PENSION TRUST FUND - DETROIT AND VICINITY, LABORERS VACATION AND HOLIDAY TRUST FUND - DETROIT AND VICINITY, LABORERS METROPOLITAN DETROIT HEALTH AND WELFARE FUND, LABORERS ANNUITY FUND - DETROIT AND VICINITY, and MICHIGAN LABORERS' TRAINING FUND,

  Plaintiffs-Appellees,

v.

INTERIOR EXTERIOR SPECIALISTS CONSTRUCTION GROUP, INC., et al.,

  Defendants,

and

INTERIOR EXTERIOR SPECIALISTS COMPANY; THE LLAMAS GROUP CORPORATION,

  Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
**Sep 08, 2010**
LEONARD GREEN, Clerk

On Appeal from the United States District Court for the Eastern District of Michigan

Before: BOGGS and COOK, Circuit Judges; and COLLIER, Chief District Judge.[*]

**PER CURIAM.** This is an action under the Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, and the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. §§ 141-187, seeking damages for alleged violations of a collective bargaining

---

[*] The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

agreement ("CBA") between Local Union 334 of the Laborers International Union of North America, AFL-CIO ("Local 334") and defendant Interior Exterior Specialists Co. ("IES"). Plaintiff fringe-benefit trust funds (the "Funds") brought suit as third-party beneficiaries to the CBA to collect allegedly unpaid fringe-benefit contributions and liquidated damages.[1]

The district court held: (1) that IES had not properly withdrawn from the CBA in 2003, and therefore remained bound by the CBA until 2006; (2) that defendant The Llamas Group Corp. ("TLG") was the alter ego of IES; (3) that IES/TLG owed the Funds $167,501.34 in unpaid fringe-benefit contributions and $33,500.29 in liquidated damages for the years 2000-2006; and (4) that IES/TLG were not entitled to reimbursement or an offset for alleged overpayments to the Funds. We hold that the district court erred in its conclusion that IES remained bound by the CBA during the 2003-2006 time period, but otherwise find no error in its conclusions. Accordingly, we affirm in part, reverse in part, and remand.

## BACKGROUND

On July 28, 1997, Rito Julian Llamas ("Rito") formed IES, a subcontractor performing selective demolition and special coatings. Rito is the sole shareholder and officer of IES. On March 30, 1999, Julie Llamas ("Julie"), Rito's wife, formed TLG, a general contractor that also does some demolition and painting. Julie is the sole shareholder of TLG. As a general contractor, TLG occasionally subcontracts work to IES, although TLG and IES do not execute written contracts in

---

[1] The Funds are administered for the benefit of employees represented by Locals 334, 1076, and 1191 of the Laborers International Union of North America, AFL-CIO. This case, however, involves only fringe-benefit contributions allegedly owed on behalf of Local 334 workers.

connection with these jobs, as TLG and its other subcontractors do. Both companies are located in the same building, which is jointly owned by Rito and Julie. IES pays all the bills for the building and assesses an annual management fee against TLG.

On April 6, 2000, IES signed a CBA with Local 334. The opt-in agreement governing the relationship between IES and Local 334 contained a so-called "evergreen provision" concerning the periodic renewal of the CBA. The relevant section provided:

> [IES] agrees that, unless the Union is notified to the contrary by [IES] by registered mail at least sixty (60) days prior to the expiration date of this Agreement or any subsequent Agreement, [IES] will be bound by and adopt any Agreement reached by the Union and the [multi-employer bargaining unit] during negotiations which follow notice by the Union [as provided in a previous paragraph].

The CBA's term was to expire on May 31, 2003.

On March 3, 2003, as the end of the term approached, IES executed a power of attorney in favor of Forrest Henry ("Henry"), the Director of Labor Relations for the Construction Association of Michigan, a multi-employer bargaining unit. The power of attorney authorized Henry to bind IES to the successor CBA which the multi-employer unit was negotiating with Local 334. However, on March 28, 2003 (i.e., 64 days prior to the CBA's expiration date), Rito sent a letter by registered mail to Scott Covington ("Covington"), the business manager of Local 334, stating: "Please be advised that if the contract is not negotiated to our satisfaction before the expiration date of the 2000 to 2003 contract, we will not be renewing our contract with Local 334." That same day, Rito sent another letter to Covington, stating: "Please be advised that [IES] is hereby giving notice, in accordance with Article XXXIII, 'Changes', of the 2000-2003 [CBA], of its desire to negotiate changes in the Agreement. I will contact you in the near future to schedule a meeting for this purpose."

Thereafter, Local 334 refused to negotiate individually with IES. The sixty-day deadline referred to in the CBA expired on April 1. On May 20, 2003, Rito sent another letter to Covington, stating: "In light of your refusal and total disregard to contract negotiations [sic], be advised that IES still intends to terminate its contract with Local 334 according to [IES's] letter . . . dated March 28, 2003. As of June 1, 2003[,] [IES] ha[s] no further contractual obligations to Local 334."

On June 1, 2003, acting in his capacity as representative of the Construction Association of Michigan, Henry executed a new CBA with Local 334 for the 2003-2006 time frame on behalf of multiple employers who had delegated to him the authority to do so. At that time, Henry was under the impression that he no longer "retained any authority or assent to enter into [a new CBA] on behalf of IES," owing to Rito's March 28, 2003 letters. After the 2003-2006 CBA was executed, Rito received calls from Covington and the Funds' collection administrator inquiring whether IES would enter into a new CBA with Local 334. Furthermore, after the new CBA was executed, Local 334's business agent insisted that IES sign one-time Project Labor Agreements for specific IES projects; such agreements are not necessary where an employer is covered by a CBA.

On January 4, 2004, the Funds requested an audit of IES, TLG, and several other companies to determine the amount of money owed to the Funds under the CBA's fringe-benefit-contribution provisions. IES and TLG declined, asserting that IES was no longer a party to the CBA and that TLG had never been a party to the CBA. The Funds filed this lawsuit on November 18, 2004, seeking, among other things, a court order directing the defendants to submit to an audit.[2] On March

___

[2] The other companies whom the Funds sought to audit were also originally named as defendants, but were dismissed before trial and are not involved in this appeal. We use the word

11, 2005, the district court ordered IES and TLG to submit all records and documents to the Funds for an audit, which was completed and released on May 19, 2005. On March 24, 2006, Rito sent a letter to Covington, stating that IES continued to believe that it was not bound by the 2003-2006 CBA, and that, in any event, IES would "not be renewing [the alleged] contract with Local 334 upon expiration of the contract term on May 31, 2006."[3]

The parties filed cross-motions for summary judgment on the issues of when IES's obligations under the CBA had terminated and whether TLG was bound by the CBA as IES's alter ego. The district court determined that IES had not properly terminated its obligations before the expiration of the 2000-2003 term, and was thus bound as a matter of law through the end of the 2003-2006 term. As to TLG's alter-ego liability, the district court found that a factual dispute precluded summary judgment. Both sides filed motions for reconsideration, which were denied.

A bench trial was held on the Funds' alter-ego claim and on IES's counterclaim for a refund or offset of $67,828.71 it alleged it had overpaid to the Funds. At the close of the Funds' case-in-chief, the defendants moved for judgment as a matter of law that TLG was not IES's alter ego. The district court determined, based on the testimony and evidence presented by the Funds, that the companies appeared to share management, employees, and equipment; consequently, it denied the motion.[4]

---

"defendants" in this opinion to refer only to IES and TLG.

[3] There is no dispute that IES's obligations under the CBA did not continue past that date.

[4] For example, in addition to the facts noted previously, two IES employees testified that they had received checks from both IES and TLG when working on the same project and that they

Following trial, the district court issued an opinion holding that TLG was the alter ego of IES and that IES had used TLG to avoid its fringe-benefit-payment obligations under the CBA. The district court also held that IES was not entitled to a refund or a credit for any overpayments it claimed to have made to the Funds. The district court entered judgment in favor of the Funds in the amount of $167,501.34 in unpaid fringe-benefit contributions (for both IES and TLG jobs) and $33,500.29 in liquidated damages. Defendants timely appealed.

## STANDARDS OF REVIEW

Although defendants appeal several orders of the district court, this appeal raises only three issues of law: when IES's obligations under the CBA were terminated, whether TLG was an alter ego of IES, and whether IES is entitled to reimbursement for alleged overpayments.

The contract-termination issue was decided on summary judgment. An order granting summary judgment is reviewed de novo. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence in the light most favorable to the non-movant and make all reasonable inferences in the non-movant's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

---

had used the same vehicles and equipment for both IES and TLG jobs.

The alter-ego issue was addressed in the district court's denial of defendants' motion for judgment as a matter of law, and again in the district court's post-trial opinion. An order on a motion for judgment as a matter of law should be granted where "a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 352-53 (6th Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1)). We generally review a district court's decision to deny such a motion de novo, *id.*; however, this particular order turns entirely on the determination of alter-ego status, which "is a question of fact to be reversed only if clearly erroneous." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587 (6th Cir. 2006) (citing *NLRB v. Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990)). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009).

The counterclaim for reimbursement, as we will address further below, involves the district court's denial of an equitable remedy. "We review [a] district court's equitable determination for abuse of discretion." *Liberty Life Assurance Co. of Boston v. Gilbert*, 507 F.3d 952, 959 (6th Cir. 2007); *see also Marcelli v. Walker*, 313 F. App'x 839, 842 (6th Cir. 2009) ("[In] an equitable action, our standard of review is abuse of discretion."). Abuse of discretion occurs only when the district court "committed a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *ACLU v. McCreary County, Ky.*, 607 F.3d 439, 450 (6th Cir. 2010) (internal quotation marks omitted).

**ANALYSIS**

**A. Termination of the CBA**

Because Congress intended through ERISA to "give[ covered] plans the upper hand in . . . litigation in order to permit 'efficacious[ ]' recovery of 'delinquent contributions,'" *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v. A & H Mech. Contractors, Inc.*, 100 F. App'x 396, 401 (6th Cir. 2004) (quoting 126 Cong. Rec. 23,039 (1980)), courts have limited the defenses that employers may raise in ERISA collection actions. *Id.*; *see also Northwestern Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001). Some decisions have taken this to the extreme: the Ninth Circuit, for example, held that even a party's "purported termination of the [CBA] is not a legitimate defense to [a] [t]rust [f]und['s] action." *Carpenters Health & Welfare Trust Fund v. Bla-Delco Constr., Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993).[5]

We have taken a more moderate course, holding that, while many traditional contract defenses are unavailable in collection actions, trust funds are not entitled to "enforce a *nonexistent* contractual obligation," *Plumbers & Pipefitters*, 100 F. App'x at 402 (quoting *Devito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994)), at least where it is evident upon "a cursory review of the parties' actions" that the contract has been terminated, *id.* at 403 (citing *Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404 (5th Cir. 1998)); *see also id.* ("As A-H's termination defense

---

[5] In *Plumbers & Pipefitters*, however, we noted that this decision has not been followed by other circuits, and that the Ninth Circuit itself has subsequently "given the decision a narrow reading." 100 F. App'x at 403 (citations omitted).

represents a classically straightforward inquiry into whether the contract still existed, the district court permissibly considered the defense."). Allowing the assertion of a termination defense "provided the inquiry is 'superficial,'" we reasoned, "sensibly balances the competing interests in [a fund's] avoiding complex litigation . . . and ensuring that the employer has a legitimate contractual obligation to make employee contributions." *Id.* (quoting *Louisiana Bricklayers*, 157 F.3d at 409 n.12). For a termination to be effective, this limited inquiry must reveal that the employer "unequivocally . . . communicat[ed] the intent to withdraw . . . ." *Id.* at 400 (quoting *Sheet Metal Workers' Int'l v. Herre Bros. Inc.*, 201 F.3d 231, 244 (3d Cir. 1999)).

The question in this case is whether Rito's actions met this standard. We have examined whether a termination notice was sufficiently clear in two unpublished cases, holding both times that the requisite intent was sufficiently conveyed. In *Plumbers & Pipefitters*, we accepted as sufficient a timely letter stating that "A-H Mechanical Contractors, Inc., hereby withdraws its affiliation with the [multi-employer bargaining unit] and will no longer be bound by any collective bargaining agreement entered into by that historical bargaining group." *Id.* at 401. Subsequently, in *Trustees of B.A.C. Local 32 Insurance Fund v. Norwest Tile Co.*, we accepted as sufficient the following statement:

> Please treat this letter as notice by Norwest Tile Company of withdrawal by it from any employer association for purposes of collective bargaining with your union . . . . Norwest Tile . . . will not be bound by any new agreement . . . . [R]ather Norwest desires to negotiate a new collective bargaining agreement . . . on an individual basis.

No. 04-2436, 2005 WL 3440431, at *4 (6th Cir. Dec. 14, 2005).[6]

By contrast, an example of a statement that was *not* sufficient to terminate appears in *Louisiana Bricklayers*, a Fifth Circuit case upon which we relied in *Plumbers & Pipefitters* (and, indirectly, in *Norwest Tile*, which relied upon *Plumbers & Pipefitters*). In *Louisiana Bricklayers*, the employer had sent the union the following notice:

> [F]or the immediate future *we will continue to make monthly contributions* to our local benefit funds on behalf of those employees covered by the Local 4 collective bargaining agreement. If there is a change in our position, we will notify you in another letter.

157 F.3d at 406 (emphasis added). The Fifth Circuit quite sensibly held that this statement did not "unequivocally indicate[] an intention to terminate the CBA . . . ." *Id.* at 409. To the contrary, the statement affirmatively indicated that the status quo "will continue" indefinitely, unless the employer had a change of heart.

Here, Rito's timely March 28, 2003 letters are quite unlike the statement in *Louisiana Bricklayers*. In those letters, Rito clearly indicated that, come May 31, 2003, the contract between IES and the union "w[ould] *not* be renew[ed]" (emphasis added), unless the contract had been "[re]negotiated to [IES's] satisfaction." While the phrasing was conditional, none of our cases requires that an employer use the present indicative in order for its notice to pass muster. Conditionality does not automatically equal ambiguity, at least where the condition is entirely straightforward and its satisfaction (or not) is evident to all parties. *Cf. Smith v. Endell*, 860 F.2d

---

[6] The employer in *Norwest Tile* "did not subsequently participate [on an individual basis] in any negotiations for the new agreement." 2005 WL 3440431, at *4.

1528, 1531 (9th Cir. 1988) ("Smith's initial request for counsel was not equivocal or ambiguous. It was conditional, but the investigators knew the condition to be satisfied.").

The district court held to the contrary, stating that a reviewing court may not look beyond the four corners of "the [termination] documents themselves" to see whether a termination was effected. Because Rito's March 28 letters *themselves* merely conveyed the conditional possibility of termination, the district court considered that the end of the story; it believed that the parties' course of conduct after March 28, 2003 was "parol evidence" outside the scope of review in an ERISA action. *See* RE #130 at 13. In other words, the district court believed it was obligated to remain willfully blind to the undisputed facts that Local 334 *did* refuse to negotiate with IES following Rito's letters, that IES's demands for changes to the CBA were consequently *not* met, and that the condition for termination clearly specified in Rito's March 28 letters *did* come to pass.

However, we have never adopted a four-corners-of-the-document rule in cases of this sort. In fact, in *Plumbers & Pipefitters*, while acknowledging that a court's inquiry in a termination case must be "superficial," we stated that courts may conduct a "cursory review of *the parties' actions*," without purporting to limit the examination, as a rule, to the written termination notice itself. 100 F. App'x at 403 (emphasis added). Similarly, in the more dated case of *Chattanooga Mailers Union, Local No. 92 v. Chattanooga News-Free Press Co.*, we stated that "[a] notice to terminate [a CBA] must be clear and explicit," but then immediately went on to say that "[b]oth the language of the [CBA] and the parties' intent, *as manifested by past practice*, are relevant in determining whether the contract remained operative . . . ." 524 F. 2d 1305, 1312 (6th Cir. 1975) (emphasis added).

Admittedly, this circuit did hold in one ERISA collection action that funds are "entitled to rely solely on the printed terms" of their agreements with employers. *Walcher & Fox*, 270 F.3d at 1025. In *Walcher & Fox*, the question before us was whether "cryptic" and disputed handwritten notations on an otherwise unambiguous typed agreement could effect a modification of that agreement. *Id.* at 1024. We held that whatever those scribbles arguably disclosed about the parties' intent was simply irrelevant, as the printed agreement necessarily controlled. *Id.* at 1025. But we find that case readily distinguishable from this one. First of all, mid-term modification of a CBA is not one of the few defenses that courts have permitted employers to raise in ERISA collection actions. *See id.* at 1025; *Plumbers & Pipefitters*, 100 F. App'x at 402-03. Because *Walcher & Fox* turned on the nonexistence of a modification defense, it does not speak to the issue of what evidence may be considered in a case involving the recognized defense of CBA *termination*.

We also acknowledge that in *Louisiana Bricklayers*, which did involve a termination defense, the Fifth Circuit used language that might appear to suggest that resort to parol evidence is impermissible. In that case, as we have already noted, the employer sent an entirely open-ended letter stating that it *did* intend to continue abiding by the CBA for the time being. The Fifth Circuit noted that "*on the face of the document*[], whatever the letter did, it neither unequivocally indicated an intention to terminate the CBA, nor could it do so." 157 F.3d at 409 (emphasis added). However, first of all, the *Louisiana Bricklayers* opinion cited no case law holding that the reviewing court is in fact limited to considering the "face of the document[]"; the case it actually cited following its "face of the document" statement held merely that "[n]otice to terminate must be clear and explicit." *Id.* (quoting *Office & Prof'l Employees Int'l Union, Local 42, AFL-CIO v. United Auto., Aerospace*

*& Ag. Implement Workers of Am., Westside Local No. 174, UAW*, 524 F.2d 1316, 1317 (6th Cir.1975)). Further, the ostensible "termination" notice in *Louisiana Bricklayers* was also untimely, such that the "face of the document[]" language was arguably dictum. *Id.*

We therefore believe that, when a termination defense is at issue in an ERISA collection action, there is no categorical bar to the consideration of the parties' conduct following a timely attempt to terminate – at least where there is no genuine dispute of material fact regarding the parties' actions. Consequently, we hold that where an employer sends a timely, unambiguously phrased conditional notice of termination, and where the condition triggering the termination is undisputedly satisfied before a new CBA goes into effect, the employer is not bound by the new CBA.[7] The rationale for limiting contract defenses in ERISA collection actions, after all, is to prevent the "transform[ation of] run-of-the-mill collection efforts by plan trustees into expensive and complex litigation relating to the employer-union relationship." *Plumbers & Pipefitters*, 100 F. App'x at 402. Recognizing a conditional termination of this sort, where the relevant facts are not reasonably in dispute, creates little or no more expense or complexity than recognizing a termination defense bounded by the four corners of the notice-giving document. The district court's approach, we believe, does not "sensibly balance[] the competing interests" involved. *Id.* at 403.

---

[7] There is no dispute here that the triggering condition occurred. The record clearly establishes that Local 334 did not negotiate with IES, as IES had demanded; that from May 20, 2003 onwards, IES consistently proclaimed that it had indeed terminated its obligations under the CBA; and that Local 334 thereafter behaved in a manner consistent with IES's having done so.

We therefore hold that IES successfully terminated its CBA obligations effective June 1, 2003, and that the district court erred by granting summary judgment to the Funds and denying summary judgment to defendants on the termination issue.[8]

**B. Alter-Ego Status**

The alter ego doctrine "is an equitable doctrine 'developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form.'" *Trustees of the Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC*, 581 F.3d 313, 318-19 (6th Cir. 2009) (quoting *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986)) (alteration in *Detroit Carpenters*). It applies to cases "where a new employer is 'merely a disguised continuation of the old employer,'" and where "two or more coexisting employers performing the same work are in fact one business, separated only in form." *Fullerton*, 910 F.2d at 336 (quoting *S. Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)). The test is "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* (quoting *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)) (internal quotation marks omitted). The alter-ego analysis is flexible and involves a "weighing of all relevant factors." *Allcoast*, 780 F.2d at 581.

---

[8] In its brief, defendants assert that this conclusion frees them of any financial liability to the Funds whatsoever, "as any allegedly improper conduct occurred after May 31, 2003." Appellant Br. at 20. However, we cannot readily determine from the record on appeal that this is so. For example, there are suggestions in the record that IES and TLG intermingled their workforces prior to this date (and, as we determine below, the district court did not err by finding that TLG was IES's alter ego and was thereby bound by the CBA). We therefore proceed to consider the remaining issues that defendants raise on appeal, and ultimately remand to the district court to determine the effect of this holding on the damages owed to the Funds.

Appellants argue that alter-ego liability cannot exist unless the employer had the intent to evade union obligations *at the time the purported alter-ego entity was formed*. This, however, is inconsistent with our precedent. In *Allcoast*, the panel weighed the approaches of other circuits and concluded that "a finding of employer intent is not essential or a prerequisite to imposition of alter ego status," but rather, is "merely one of the relevant factors." *Id.* We recently reaffirmed this holding, stating that "evidence of an intent to evade, when it presents itself, is a relevant factor to be considered in determining whether the alter ego doctrine is applicable, . . . but it is *not* essential to the imposition of alter ago status." *Detroit Carpenters*, 581 F.3d at 319 (citing *Allcoast*, 780 F.2d at 581; *Fullerton*, 910 F.2d at 337).[9]

The district court found that TLG was an alter ego of IES based on, among other things, Julie Llamas's management work for both IES and TLG, substantial similarities in business and purpose, overlap in work force, and the fact that the entities shared administrative expenses on paper only. Further, the district court determined that IES avoided paying substantial overtime by having laborers work directly for TLG rather than subcontracting through IES. Although defendants analyze each factor separately to support their argument that TLG was not the alter ego of IES, the law clearly indicates that the test under the alter-ego doctrine is flexible and that no one factor is determinative. *Id.* at 318 ("In applying [the alter ego] factors, no individual factor is outcome determinative; instead

---

[9] The panel in *Detroit Carpenters* noted the apparently conflicting statements in *Trustees of the Resilient Floor Decorators Insurance Fund v. A&M Installations Inc.*, 395 F.3d 244 (6th Cir. 2005), but "confined [*Resilient Floor*] to its facts" to the extent it conflicted with *Allcoast* and *Fullerton*, noting that, for several reasons, *Resilient Floor* "is of limited authority." *Detroit Carpenters*, 581 F.3d at 319. Thus, defendants' extensive reliance on *Resilient Floor* is misplaced.

'all the relevant factors must be considered together.'" (quoting *Allcoast*, 780 F.2d at 582)). The record contains substantial evidentiary support for the district court's finding that IES and TLG have substantially identical management, business, purpose, operation, supervision, and ownership. Thus, we cannot find the district court's determination clearly erroneous.

## C. Reimbursement for Overpayment

The ERISA statute provides that "the assets of a plan *shall never inure to the benefit of any employer* and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." *Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 794 F.2d 221, 235-36 & n.23 (6th Cir. 1986) ("*Whitworth I*") (quoting 29 U.S.C. § 1103(c)(1)) (emphasis in *Whitworth I*). The statute recognizes, as an exception to this prohibition, that "if such contribution or payment is made by an employer . . . by a mistake of fact or law . . . paragraph (1) *shall not prohibit* the return of such contribution or payment to the employer . . . ." *Id.* (quoting 29 U.S.C. § 1103(c)(2)(A)(ii) (emphasis added). Relying on the non-mandatory language of this exception, we have stated that "[e]mployers who pay mistaken contributions have no . . . [inherent] entitlement to a refund." *Teamster's Local 348 Health & Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 321 n.6 (6th Cir. 1984). As we have noted,

> To impose . . . a requirement [to return mistaken contributions] by implication would violate the underlying statutory scheme. ERISA's primary purpose is to protect the integrity of the pension funds for the benefit of employees and their beneficiaries. . . . To impose a right to restitution in favor of employers could severely undermine the funds' integrity. Mistaken contributions, once invested, may be just as essential to the funds' integrity and stability as non-mistaken contributions. . . . ERISA surely did not

> intend to impose the risk of mistaken contributions on the funds, particularly since the employer is in the best position to monitor the amount of its own contributions.

*Whitworth I*, 794 F.2d at 231.

At the same time, we have recognized a limited right of action under federal common law for equitable restitution of mistaken payments. *See id.* at 235-236 & nn.23-24 ("An action for unjust enrichment, equitable in nature, and *developed in light of the policies of ERISA* is appropriate." (quoting *Airco Indus. Gases v. Teamsters Health & Welfare Pension Fund*, 618 F. Supp. 943, 951 (D. Del.1985)) (emphasis added)); *see also Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 982 F.2d 1006, 1010, 1013 (6th Cir. 1993) ("*Whitworth II*"). The burden on employers seeking equitable restitution is demanding. *See Whitworth I*, 794 F.2d at 236 n.24 ("Congress, in weighing the interests implicated in the context of employee benefit plans, has favored the financial soundness of the plan and held employers to high standards of accounting.").

Specifically, an employer seeking equitable restitution must affirmatively establish that: "(1) [the employer] paid contributions to [the Funds] which [the employer] was not obligated to pay pursuant to the collective bargaining agreement . . . ; (2) [the employer] requested refund of the contributions; (3) [the Funds] denied the refund; and (4) such refusal . . . was arbitrary and capricious." *Id.* at 236 n.25; *see also Frank Ciminelli Constr. Co. Inc. v. Buffalo Laborers Supplemental Unemployment Benefit Fund*, 976 F.2d 834, 835 (2d Cir. 1992) (stating that "an employer is entitled to repayment if it shows that the refusal to repay was arbitrary or capricious and the equities favor restitution," and noting that "particular concern must be given to the effect on the

financial stability of the fund") (internal quotation marks omitted)); *Award Serv., Inc. v. N. California Retail Clerks Unions and Food Employers Joint Pension Trust Fund*, 763 F.2d 1066, 1069 (9th Cir. 1985) (same). In addition to meeting these requirements, defendants must show that their gratuitous contributions were the result of "a mistake of fact or law" to come within the permissive exception to the statute's outright ban on payment of plan assets to an employer. 29 U.S.C. § 1103(c)(2)(A)(ii); *see also Whitworth II*, 982 F.2d at 1010-11.

Here, as the district court found after trial,

the defendants have offered no evidence as to why the mistaken payments were made initially, they have not shown what effect restitution in the amount sought would have on the plans' assets and obligations, and they have not demonstrated a reason for the plans' refusal to voluntarily refund or credit the payments, much less that the plans' rationale was arbitrary and capricious.

Consequently, the district court held that defendants had failed to meet their burden and were not entitled to equitable restitution. Our review of the record satisfies us that the district court did not abuse its discretion in so concluding.

**CONCLUSION**

For the reasons described above, the judgment of the district court is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent with this opinion.

**COLLIER J., dissenting in part.** I concur with the majority's conclusions the district court did not clearly err in finding TLG was the alter ego of IES and IES was not entitled to restitution. Unlike the majority, I would affirm the district court in its decision IES failed to unequivocally communicate its intent to terminate the CBA. Therefore, I must respectfully dissent from that portion of the opinion.

As the majority states, "Congress intended through ERISA to 'give [covered] plans the upper hand in . . . litigation in order to permit "efficacious[ ]" recovery of "delinquent contributions,"'" *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v. A & H Mech. Contractors, Inc.*, 100 F. App'x 396, 402 (6th Cir. 2004) (quoting 126 Cong. Rec. 23,039 (1980)). Section 515 "permit[s] multiemployer plans to 'rely upon the terms of collective bargaining agreements and plans as written, thus "permitting trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management law."'" *Bakery & Confectionary Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998) (quoting *Cent. Penn. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1103 (3d Cir. 1996)). The reason Congress gives this advantage to these covered plans is because "employee benefit plans frequently remain obligated to pay benefits to employees even when employers do not make their required contributions[.]" *Plumbers & Pipefitters*, 100 F. App'x at 402.

An employer can terminate its obligations under a CBA only "if it (1) unequivocally withdraws from the association (2) . . . before negotiations for a new contract begin (3) by

communicating the intent to withdraw to all parties." *Id.* at 400 (quoting *Sheet Metal Workers' Int'l v. Herre Bros. Inc.*, 201 F.3d 231, 244 (3d Cir. 1999)). Although a court may conduct a "superficial inquiry" into a purported termination to determine if it was timely and conveyed the requisite intent, "if the issue of termination cannot be resolved through cursory review, the defense to a section 515 action will not succeed." *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 409 n.12 (5th Cir. 1998).

The majority concludes the March 28, 2003 letter from Julian Llamas to Scott Covington suffices to unequivocally communicate IES's intent to terminate the CBA. This is where I must part company. The majority's position is a reasonable interpretation of the letter but there are other reasonable interpretations including that IES was merely positioning itself for more acceptable terms. Because there are other equally reasonable interpretations of the language, I cannot agree the language is unequivocal. The standard by which termination notices must be judged is strict because Congress intended to allow employee benefit plans to rely on the language without having to resort to litigation. Thus, courts require *unequivocal* language in conveying an intent to terminate. If there is any doubt as to the intent to terminate, the notice fails.

Because I find the language used by IES in its notice does not unequivocally convey its intent to terminate the CBA, I would affirm the district court's grant of summary judgment and would find IES was bound by the 2003 to 2006 CBA. Therefore, I respectfully dissent from that portion of the majority opinion.