# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2521

_____

Twin City Pipe Trades Service Association, Inc., a Minnesota non-profit corporation

*Plaintiff - Appellant*

v.

Frank O'Laughlin Plumbing & Heating Company, a Minnesota corporation, doing business as O'Laughlin Plumbing & Heating

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 15, 2014
Filed: July 17, 2014

_____

Before WOLLMAN, BYE, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

This is an action brought pursuant to 29 U.S.C. § 1145[1] to collect fringe benefits allegedly owed to union employee benefit funds by a plumbing company. The district court determined Frank O'Laughlin Plumbing & Heating Company (O'Laughlin)

_____

[1]Section 515 of the Employee Retirement Income Security Act (ERISA).

unequivocally terminated its participation in a collective bargaining agreement (CBA) with Plumbers and Pipe Fitters Local 6 (the Union), and thus was not required to contribute fringe benefits for work performed by O'Laughlin's employees. We reverse and remand for further proceedings.

I

O'Laughlin has been a signatory contractor to successive CBAs with the Union since at least 2000. At the start of the 2011 calendar year, O'Laughlin was a signatory to the CBA then in effect. The terms of the pertinent CBA stated it was in full force and effect between December 1, 2009, and April 30, 2011, and required O'Laughlin to contribute to employee benefit funds for all pipe work performed by its employees. The CBA further provided it would "remain in effect from year to year thereafter" unless either party "notif[ied] the other in writing ninety (90) days prior to the expiration date of the intent to cancel or amend this Agreement, or to renegotiate a new Agreement."

On January 27, 2011, O'Laughlin sent a letter to the Union which stated the plumbing company would be "terminating its existing work agreement[] with Local # 6 Plumbers & Fitters Effective January 31 2011." By its plain terms, then, the letter purported to terminate O'Laughlin's participation in the CBA on a date different than the CBA's expiration date of April 30, 2011, and purported to give only four days' notice rather than the ninety-day notice required by the CBA. For the three months following January 31, 2011, however, O'Laughlin nonetheless complied with the terms of the CBA by making fringe benefit contributions on behalf of its employees.

In the spring of 2011, the Union began negotiations with the other signatory contractors for a new CBA commencing May 1, 2011. Corey O'Laughlin, one of the owners of O'Laughlin, attended several negotiation meetings with members of the Union's management between February 15, 2011, and April 26, 2011. O'Laughlin's

principal owner, Kim O'Laughlin, also met with Union management several times after May 1 – when the new CBA was in place – in attempts to negotiate specific CBA terms to address O'Laughlin's difficulties competing in the market (O'Laughlin operates in Winona County, a smaller market than the Minneapolis/St. Paul area where most of the signatory contractors operate, and O'Laughlin was having difficulty competing with non-union plumbers in Winona County). O'Laughlin acknowledged he met with union representatives to discuss O'Laughlin's difficulties competing against non-union plumbers and to see what the Union "could do to help them out."

After May 1 – when the new CBA was in place – and throughout the rest of the 2011 calendar year, O'Laughlin continued to make fringe benefit contributions on behalf of its employees. In December 2011, the terms of the new CBA increased the local pension rate by six cents per hour. For the month of December, O'Laughlin's fringe benefits contributions included the rate increase set forth in the new CBA.

On December 27, 2011, O'Laughlin sent the Union a second letter. This letter stated O'Laughlin "will be terminating all existing work agreement with Local #6 Plumbers and Pipe fitters effective January 1, 2011. We will not be employing any union members, paying any dues at that time." Shortly thereafter, four O'Laughlin employees sent letters to the Union resigning their membership in the Union. Beginning January 1, 2012, O'Laughlin stopped submitting fringe benefits contributions on behalf of its employees, but continued to employ individuals performing work of the kind subject to the CBA.

Twin City Pipe Trade Services Association (Twin City) is the non-profit corporation designated to receive the fringe benefit payments made by the signatory contractors to the CBA. After O'Laughlin stopped making contributions on behalf of its employees, Twin City brought this action to collect fringe benefits allegedly owed by O'Laughlin. Twin City contended O'Laughlin never effectively terminated its

-3-

participation in the 2009-2011 CBA, and therefore remained obligated to contribute fringe benefits on behalf of its employees.

Twin City moved for summary judgment in the district court. In response, O'Laughlin filed affidavits and other evidence to explain the two letters it sent on January 27 and December 27, 2011, its participation in the negotiations for a new CBA, and the fringe benefit contributions it made on behalf of its employees throughout 2011.

As to the first letter sent on January 27, Kim O'Laughlin explained the letter's stated termination date of January 31 was intended to reflect compliance with the ninety-day notice period in the 2009-2011 CBA, rather than a reference to the actual termination date of the CBA. As to the second letter sent on December 27, Kim O'Laughlin explained it merely reiterated that the CBA was no longer in effect. Kim O'Laughlin did not explain the second letter's reference to an effective termination date of January 1, 2011, which was inconsistent with the January 31 date referenced in the first letter, and inconsistent with O'Laughlin's post hoc explanation that the January 31 date was intended to reflect the beginning of the ninety-day notice period. O'Laughlin now contends the second letter's reference to January 1, 2011, was a typographical error, and the letter should have said January 1, 2012. A January 1, 2012, termination date is, however, also inconsistent with the first letter and inconsistent with the CBA's expiration date of April 30, 2011.

With respect to its participation in negotiations for a new CBA during the spring of 2011, Corey O'Laughlin explained he attended the meetings to see if the parties could reach a special deal that would have brought O'Laughlin back into a CBA with the Union, but the negotiations were unsuccessful.

Finally, with respect to the fringe benefit contributions O'Laughlin continued to make on behalf of its employees throughout the 2011 calendar year (which included

complying with rate increases set forth in the new CBA during the month of December), Kim O'Laughlin explained the payments were only made voluntarily as a "gesture of good will," and thus O'Laughlin did not consider itself still bound by the CBA when making the payments.

After considering the parties' summary judgment filings, the district court granted summary judgment in favor of O'Laughlin.[2]  First, the district court noted courts generally limit the defenses an employer can raise in a suit brought pursuant to 29 U.S.C. § 1145 to collect fringe benefits, and the purported termination of the CBA is not widely recognized as such a defense.  See Central States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co., 919 F.2d 1343, 1349 (8th Cir. 1990) ("In sum, the courts recognize only two defenses to a collection action:  that the pension contributions are themselves illegal or that the collective bargaining agreement is void.") (citing Benson v. Brower's Moving & Storage, 907 F.2d 310, 314 (2d Cir. 1990)).  The district court nonetheless held O'Laughlin could argue it had terminated its participation in the CBA as a defense in this collection action, citing a decision from the Sixth Circuit and a Minnesota district court decision recognizing such a defense.  See Laborers Pension Trust Fund-Detroit & Vicinity v. Interior Exterior Specialists Constr. Grp., 394 F. App'x 285, 290 (6th Cir. 2010) ("[W]hile many traditional contract defenses are unavailable in collection actions, trust funds are not entitled to enforce a nonexistent contractual obligation, at least where it is evident upon a cursory review of the parties' actions that the contract has been terminated[.] Allowing the assertion of a termination defense provided the inquiry is superficial . . . sensibly balances the competing interests in a fund's avoiding complex litigation . . . and ensuring that the employer has a legitimate contractual obligation to make employee contributions.") (internal quotation marks and citations omitted); Heimerl

_____

[2]O'Laughlin did not formally bring a cross-motion for summary judgment. But in opposing Twin City's motion for summary judgment, O'Laughlin requested summary judgment in its favor if the district court found the CBA was properly terminated.

v. Tech Elec. of Minn., Inc., No. 12-cv-612, 2013 WL 1364249, at *5-6 (D. Minn. Apr. 4, 2013) (recognizing a termination defense in a fringe benefit collection action).[3]

Having determined O'Laughlin could raise a termination defense, the district court limited its inquiry to a cursory review of the parties' actions to determine whether O'Laughlin unequivocally communicated its intent to withdraw from the CBA.[4] See Laborers Pension Trust, 394 F. App'x at 290 ("For a termination to be effective, this limited inquiry must reveal that the employer unequivocally communicated the intent to withdraw.") (internal quotation marks and citation omitted). In its limited review of the parties' actions, the district court credited Kim O'Laughlin's explanation of the first letter sent on January 27, 2011, finding the letter unequivocally expressed O'Laughlin's intent to terminate its participation in the CBA and complied with the CBA's 90-day notice requirement. The district court further determined O'Laughlin's subsequent conduct in making voluntary payments throughout 2011 did not invalidate the termination, nor did O'Laughlin's participation in negotiations for a new CBA. The district court concluded: "O'Laughlin is a small company that tried to do the right thing and made some missteps in the process. These missteps, however, are not enough to negate its unequivocal termination of the CBA."

---

[3]Other courts also appear to have recognized a termination defense in a fringe benefits collection action. See, e.g., La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co., 157 F.3d 404, 409 n.12 (5th Cir. 1998).

[4]To the extent courts have held a termination defense is available in an action to collect fringe benefits, they have limited their inquiry to a cursory review of the parties' actions in order to keep the collection action from becoming complex or costly. See Central States, 919 F.2d at 1348 (explaining that collections actions had become complex and costly prior to the enactment of § 1145, riddled with various contract formation defenses, and Congress intended to simplify such actions by passing the statute).

-6-

Twin City filed a timely appeal. On appeal, Twin City argues the district court erred in concluding O'Laughlin unequivocally terminated its participation in the CBA.

## II

We review the district court's grant of summary judgment de novo. Stein v. Chase Home Finance, LLC, 662 F.3d 976, 979 (8th Cir. 2011).

On appeal, O'Laughlin urges this court to recognize termination as a valid defense in a fringe benefits collection action brought pursuant to 29 U.S.C. § 1145. O'Laughlin further asks us to affirm the district court's determination that O'Laughlin unequivocally expressed its intent to terminate its participation in the CBA. We decline to formally recognize a termination defense in this case, however, because the circumstances involved here would not support such a defense in any event. The two letters O'Laughlin sent to the Union in January and December 2011 purporting to terminate O'Laughlin's participation in the CBA, when viewed alongside O'Laughlin's inconsistent conduct throughout 2011 by continuing to make fringe benefit payments, do not evince the unequivocal intent necessary to terminate participation in a CBA. See, e.g., Int'l Union of Operating Eng'rs, Local No. 181 v. Dahlem Constr. Co., 193 F.2d 470, 475 (6th Cir. 1952) (indicating the "notice to terminate [a CBA] must be clear and explicit").

We conclude O'Laughlin did not unequivocally express an intent to terminate its participation in the CBA for two reasons. First, under the circumstances involved in this case, our examination of O'Laughlin's conduct is paramount to our consideration of the two letters it sent to the Union. An employer's conduct is important because "it is well established that a collective bargaining agreement is not dependent on the reduction to writing of the parties' intention to be bound. All that is required is conduct manifesting an intention to abide and be bound by the terms of an agreement." Capitol-Husting Co., Inc. v. N.L.R.B., 671 F.2d 237, 243 (7th Cir.

-7-

1982) (internal citation omitted); see also Central States, 919 F. 2d at 1353 (citing Robbins v. Lynch, 836 F.2d 330, 332 (7th Cir. 1988)).[5] Here, O'Laughlin manifested an intention to abide and be bound by the terms of the CBA by continuing to make fringe benefit contributions on behalf of its employees throughout the 2011 calendar year.

The district court discounted O'Laughlin's conduct because Kim O'Laughlin explained he made the fringe benefit contributions voluntarily as a gesture of good will. But a benefit fund such as Twin City "is entitled to 'assume that all participating employers in a plan are following *the stated terms*: no other approach permits accurate actuarial computations and proper decisions about which claims to pay.'" Id. at 1349 (quoting Robbins, 836 F.2d at 333) (emphasis added in Central States). The stated terms of the CBA do not contemplate employers making voluntary payments. When an employer's objective conduct indicates a continued acceptance of the CBA, while at the same time the employer inconsistently states it intends to terminate the CBA, we are hard pressed to conclude the intent to terminate is clear, explicit, and unequivocal. See Miner v. Local 373, 513 F.3d 854, 861 (8th Cir. 2008) (determining the validity of a CBA based on "the objective intent of the parties – not their subjective beliefs"). If we concluded otherwise, the administrator of a benefit plan would have no concrete manner by which to determine whether an employer is bound or not bound by the terms of the CBA.

_____

[5]In Robbins, an employer who had signed a master CBA in 1975, "never signed the 1979-82 agreement . . . [but] paid the union scale, turned over dues under a checkoff system, negotiated grievances, and paid (some) pension and welfare contributions. It later invoked the termination clause of the agreement. Employers may adopt a collective bargaining agreement by a course of conduct . . . [Employer] did so . . . [Employer] may have had a private intent [to no longer be bound], but the signs visible to the union all pointed to [Employer's] acceptance of the collective bargaining agreement. [Employer] is bound by its terms." 836 F.2d at 332.

Second, the two letters O'Laughlin sent to the Union were ineffective to express an unequivocal intent to terminate participation in the CBA in any event. The first letter clearly stated O'Laughlin intended to terminate its participation in the CBA "effective January 31, 2011." This statement was ineffective because O'Laughlin was obligated to participate in the CBA through April 30, 2011, and could not unilaterally terminate the CBA on a different date. The first letter did not explicitly refer to the CBA's 90-day notice provision, nor did it reference the correct termination date of April 30, 2011. Thus, the first letter was not the type of "clear and explicit" notice required to express an unequivocal intent to terminate.

The second letter added nothing to help clarify the first letter. Like the first letter, it did not refer to the correct termination date of April 30, 2011. Indeed, the second letter merely added to the confusion because it was inconsistent with the first letter. The first letter purported to terminate participation in the CBA at the end of January 2011, while the second letter purported to terminate participation in the CBA at the beginning of January 2011. Even if we credited O'Laughlin's explanation of the second letter as containing a typographical error, the two letters would still be inconsistent – the first letter would have purported to terminate participation in the CBA at the end of January 2011, while the second letter would have purported to terminate participation in the CBA eleven months later. Neither of those dates was a permissible date upon which to terminate the CBA pursuant to its provisions. The two letters did not, therefore, unequivocally express the clear and explicit intent necessary to terminate participation in a CBA.

III

We reverse the district court and remand this case for further proceedings to determine what amounts O'Laughlin is still obligated to contribute to the employee benefit plans managed by Twin City.

_____