PLUMBERS & PIPEFITTERS LOCAL UNION NO. 572 HEALTH AND WELFARE FUND, Plumbers & Pipefitters Local Union No. 572 Pension Fund, Plaintiffs–Appellants,

v.

A&H MECHANICAL CONTRACTORS, INC., Defendant–Appellee.

No. 02–6131.

United States Court of Appeals, Sixth Circuit.

June 1, 2004.

R. Jan Jennings, Carroll D. Kilgore, Branstetter, Kilgore, Stranch & Jennings, Nashville, TN, for Plaintiffs–Appellants.

Richard L. Colbert, Kent B. Thomas, Colbert & Winstead, Nashville, TN, for Defendant–Appellee.

Before SUHRHEINRICH, GIBBONS and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

The Plumbers and Pipefitters Local Union No. 572 entered into a collective bargaining agreement with a multi-employer association, which included A–H Mechanical Contractors, Inc. (whom the plaintiffs mistakenly refer to as "A & H Mechanical Contractors, Inc.") as one of its members. The agreement required participating employers to make contributions to the Union's Health and Welfare Fund and Pension Fund on behalf of employees. When A–H tried to terminate the agreement and to discontinue its contributions, the funds sued the company under § 515 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1145. Determining that A–H had properly terminated its participation in the collective bargaining agreement, the district court granted A–H's summary judgment motion and denied the Funds' request for a preliminary injunction. As we agree with that conclusion, we affirm.

## I.

A–H Mechanical Contractors was a member of a multi-employer association known as The Master Plumbing, Heating, Piping and Air Conditioning Contractors of Nashville and Vicinity (the "Association"). On behalf of its member employers, the Association entered into a collective bargaining agreement with the Plumbers and Pipefitters Local Union No. 572 (the "Union"), which became "effective [on] May 1, 1998" and extended "through April 30, 2001" ("the 1998 Agreement"). The 1998 Agreement required employers to contribute to the Union's Health and Welfare Fund and Pension Fund (the "Funds") at fixed rates per employee-hour worked. As provided in the agreement, these rates increased each year from May 1, 1998 to April 30, 2001. The 1998 Agreement also contained an "evergreen" clause, which renewed the contract each year unless a contracting party gave notice of termination at least 60 days before April 30, 2001.

On February 19, 2001, the Chairman of A–H, V.H. Alessio Jr., wrote a letter to the Union and the Association advising them that "A–H Mechanical Contractors, Inc., hereby withdraws its affiliation with the [Association] and will no longer be bound by any collective bargaining agreement entered into by that historical bargaining group." After sending the letter, A–H did not participate in negotiations between the Union and the Association regarding a new collective bargaining agreement, which the parties eventually signed on April 30, 2001 and which became "effective May 1, 2001 through April 30, 2007" (the "2001 Agreement"). Nonetheless, A–H continued to make contributions to the Funds at the prevailing rates of the 2001 Agreement on behalf of several specific employees for several months.

Shortly after A–H discontinued these contributions in October or November 2001, the Funds filed this lawsuit, alleging that A–H "was [ ] obligated to pay contributions on behalf of employees covered by the collective bargaining agreement" to the Funds. See 29 U.S.C. § 1145 (requiring employers "obligated to make contributions to a multiemployer plan" to "make such contributions"). The Funds requested a judgment in the amount of contributions owed and an injunction to enforce future contributions.

Soon after filing the lawsuit, the Funds opened a second front in the dispute. Invoking the "Grievance Procedures" of the 1998 and 2001 Agreements, they filed a grievance against A–H with the Joint Arbitration Committee, which is composed of three Association representatives and three Union representatives. See 1998 Agreement, art. XII § 2 ("All differences

... as to interpretation and meaning of the Agreement between the parties shall be settled in accordance with the following procedures: ... (B) In the event that the dispute is not so settled, it shall be referred to the Joint Arbitration Committee."). The Committee met on February 1, 2002, and decided (without A–H's participation) that "A–H had agreed to be a party to the [2001 Agreement] and as such should be accountable to the various funds and commitments of the agreement." In the Committee's view, A–H had acquiesced in the new agreement by continuing to make contributions to the Funds on behalf of several employees.

In ruling on the parties' cross-motions for summary judgment, the district court held that A–H's letter of February 19, 2001(1) terminated the 1998 Agreement and (2) precluded A–H from becoming a party to the 2001 Agreement by withdrawing the company from the Association before negotiations for the 2001 Agreement had commenced. As a result, the court concluded, A–H owed no contributions to the Funds beyond April 30, 2001.

## II.

On appeal, the Funds make three arguments: (1) the Joint Arbitration Committee permissibly and conclusively determined that A–H by its conduct became a party to the 2001 Agreement, a determination that bound the district court; (2) A–H failed as a matter of law to notify the Funds and the Union that it was withdrawing from the 1998 Agreement; and (3) A–H's termination "defense" may not be asserted in response to an ERISA plan's claim for contributions under 29 U.S.C. § 1145. We give a fresh look to each of the legal issues as well as to the district court's decision to grant summary judgment in favor of A–H. *Pinney Dock &*

*Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.1988).

## A.

█ The Funds initially argue that the Joint Arbitration Committee's decision—to the effect that A–H became a party to the 2001 Agreement by virtue of its conduct—was binding on the district court. We disagree.

Federal courts, it is true, generally give considerable deference to the arbitration process and to arbitration decisions themselves. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). But that general rule does not apply where the arbitration decision at issue exceeds the scope of authority delegated to the arbitrator by the parties' agreement. " '[A]rbitration,' " the Supreme Court has explained, remains " 'a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); *see also First Options of Chicago v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."). Whether the parties agreed to submit a particular dispute to arbitration involves a "gateway" arbitrability question—as compared to a "procedural" arbitrability question—that courts rather than arbitrators presumptively decide, unless the parties have "clearly and unmistakably" indicated otherwise. *See Howsam*, 537 U.S. at 83–84 (quotation omitted).

In this case, the question submitted to and resolved by the Joint Arbitration Committee is one that A–H did not agree to arbitrate. Far from assessing whether A–H properly terminated the 1998 Agreement—which might be a procedural arbitrability question—the committee decided just the opposite: it appeared to assume that A–H did terminate the 1998 Agreement but that its post-termination conduct (*e.g.,* continuing to make contributions) amounted to acquiescence in the "newest working agreement," *i.e.,* the 2001 Agreement. Having claimed not to have become a party to the 2001 Agreement and having disclaimed any authority by the Association to make it a party to the new agreement, A–H could permissibly expect a court, not an arbitration panel set up under the new agreement, to determine whether it had become bound by the 2001 Agreement.

Nor can the Funds tenably maintain that the committee's arbitration authority stemmed from the 1998 Agreement. Although "a party's obligation to arbitrate does not automatically cease upon termination of the collective bargaining agreement," the dispute submitted to arbitration still must be one that arises under the terminated agreement. *Gen. Drivers, Salesmen & Warehousemen's Local Union No. 984 v. Malone & Hyde, Inc.,* 23 F.3d 1039, 1045 (6th Cir.1994). Here, however, the arbitration addressed an issue arising not under the 1998 Agreement (which the arbitrator assumed had been terminated), but under a new contract that A–H did not sign.

### B.

▉ The parties share common ground in discussing the legal principles underlying the Funds' notice argument. Under ERISA § 515, employers (like A–H) who are "obligated to make contributions to a multiemployer plan" (like the Funds' plan) must as a matter of federal law "make such contributions." 29 U.S.C. § 1145. An employer's contractual obligation to make these contributions may arise from a collective bargaining agreement, including one involving several employers. *See Carpenters S. Cal. Admin. Corp. v. Russell,* 726 F.2d 1410, 1413 (9th Cir.1984). These obligations, however, do not bind any one employer into perpetuity. An "employer may abandon" a multiemployer bargaining unit and may terminate its obligations to make ERISA plan contributions "if it (1) unequivocally withdraws from the association (2) . . . before negotiations for a new contract begin (3) by communicating the intent to withdraw to all parties." *Sheet Metal Workers' Int'l v. Herre Bros. Inc.,* 201 F.3d 231, 244 (3d Cir.1999) (citing *Retail Assocs., Inc.,* 120 N.L.R.B. 388, 393, 395 (1958)); *see also N.L.R.B. v. Sklar,* 316 F.2d 145, 150 (6th Cir.1963) ("Membership of an employer in a multi-employer unit is wholly voluntary. . . . The Board may not . . . prevent [any employer] from exercising his right to withdraw therefrom at an appropriate time."). Although termination may result in statutory withdrawal liability for a proportionate share of vested, unfunded benefits, *see* 29 U.S.C. § 1381–1461, or may in some instances constitute an unfair labor practice, *see Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988), those issues are not presented here.

The rub in this case is whether A–H's attempt to terminate its membership in the Association permissibly ended its contribution obligations on April 30, 2001. The 1998 Agreement contains a termination-or-renewal provision, which reads as follows:

> [T]he termination date [of] this Contract is **April 30, 2001,** and this Contract shall

be extended on a year to year basis following that date, unless any party to this Contract shall give written notice not later than sixty (60) days prior to **April 30, 2001** ... and in the event of any party so giving notice, this Contract shall terminate and be of no further force and effect after **April 30, 2001.**

1998 Agreement, art. XIII § 6. Attempting to comply with this provision, the Chairman of A–H sent the Association and Union letters, which in their entirety both said: "Please be advised that A–H Mechanical Contractors, Inc., hereby withdraws its affiliation with the [Association] and will no longer be bound by any collective bargaining agreement entered into by that historical bargaining group."

By their terms, the letters properly terminated A–H's obligations under the existing 1998 Agreement and prevented those obligations from renewing automatically. The letters express A–H's intent to terminate the 1998 Agreement and its intent not to be bound by any future agreements. As to the 1998 Agreement, the letters communicate A–H's withdrawal as to "any collective bargaining agreement entered into" previously. As to future agreements, the withdrawal letters say that A–H "hereby withdraws" from the Association.

The notice also makes it clear that A–H was not, and could not be, a party to the 2001 Agreement. The notice withdrew A–H from the Association and rescinded any authority that the Association previously had to bargain on its behalf. In this respect, the notice was both unequivocal (stating that A–H "hereby withdraws its affiliation with the [Association]") and timely (it was given before the Union and the Association entered negotiations for a new agreement).

The Funds offer two arguments in response, each of them unavailing. First, even if A–H "effectively gave notice to withdraw from the multi-employer bargaining unit," they say that the letter "**did not** give notice of intent to modify or terminate" the 1998 Agreement. Appellant's Br. at 12. But the unyielding reference to all collective bargaining agreements and the use of the past tense in communicating that purpose—as in A–H "will no longer be bound by *any* collective bargaining agreement *entered* into by that historical bargaining group" (emphasis added)—suffice to defeat this claim.

Second, the Funds argue that A–H failed to file an answer in this case and accordingly conceded the allegation in the complaint that "[d]uring all pertinent times, [A–H] was party to a collective bargaining agreement [ ] [p]ursuant to [which], [A–H] was to pay certain contributions." But in invoking this procedural rule, the Funds must submit to a procedural requirement for raising it. Namely, while it is true that A–H did not file an answer, the Funds never raised this argument below when the parties filed their competing motions for summary judgment. As a general matter, we "will not consider arguments raised for the first time on appeal unless [ ] failure to consider the issue will result in a plain miscarriage of justice." *United States v. Ninety–Three Firearms,* 330 F.3d 414, 424 (6th Cir.2003) (quotation omitted). Only a decision forgiving one party for failing to adhere to a procedural rule while punishing the other for a comparable error would pose an affront to justice in this instance. In the final analysis, the district court correctly determined that A–H's termination notice fulfilled the requirements of the 1998 Agreement for termination and that A–H did not become bound by the 2001 Agreement.

C.

▪ The Funds next contend that employers like A–H may not assert a termi-

nation defense at all in response to an ERISA lawsuit for contributions under § 515. This, too, is mistaken.

Under traditional contract law principles, third-party beneficiaries of a contract are subject to the same enforcement defenses as the original contracting party. *See Bituminous Coal Operators' Ass'n, Inc. v. Connors,* 867 F.2d 625, 632 (D.C.Cir.1989). Applied here, those principles mean that while the collective bargaining agreement between A–H and the Union may be enforced by a third-party beneficiary of the agreement (the Funds), A–H may assert against the Funds any contract defense it would have against the original contracting party (the Union). In this instance, in other words, A–H may defeat the Funds' claim by raising the defense that it had terminated the underlying contract.

The Funds do not dispute these principles of contract law; they instead claim that § 515 of ERISA alters these principles in the context of an action to collect contributions by an ERISA plan. Under § 515:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

29 U.S.C. § 1145.

As the Funds correctly point out, numerous courts have construed this provision to preclude certain contract law defenses that would transform run-of-the-mill collection efforts by plan trustees into expensive and complex litigation relating to the employer-union relationship. *See Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.,* 157 F.3d 404, 408 (5th Cir.1998); *Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3d Cir.1992); *Benson v. Brower's Moving & Storage,* 907 F.2d 310, 314 (2d Cir.1990); *Cent. States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1153 (7th Cir.1989) (en banc); *Bituminous Coal Operators' Ass'n,* 867 F.2d at 634; *Southwest Adm'rs, Inc. v. Rozay's Transfer,* 791 F.2d 769, 773 (9th Cir.1986); *cf. Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co.,* 133 F.3d 955, 960 (6th Cir.1998) (deciding that employee benefit fund was entitled to rely on written bargaining agreement). Because employee benefit plans frequently remain obligated to pay benefits to employees even when employers do not make their required contributions, and because "anything less may well saddle the plans with unfunded obligations," *Gerber Truck,* 870 F.2d at 1153, Congress has given these plans the upper hand in § 515 litigation in order to permit "efficacious[ ]" recovery of "delinquent contributions," 126 Cong. Rec. 23,039 (1980) (remarks by Rep. Thompson).

In view of these realities of plan management, courts have permitted defendants in these actions to raise only a few discrete "defenses": (1) illegality of the original contract; (2) arguments that the contract was void at its inception (*e.g.,* by fraud in the execution); and (3) decertification of the union. *See Alfred Miller Gen. Masonry,* 157 F.3d at 408; *Agathos,* 977 F.2d at 1505. In addition, employee benefit funds "are not entitled to enforce a *nonexistent* contractual obligation." *DeVito v. Hempstead China Shop, Inc.,* 38 F.3d 651, 654 (2d Cir.1994) (quotation and citation omitted) (emphasis added); *see also Alfred Miller Gen. Masonry,* 157 F.3d at 409 & n. 12 (stating that a district court

may consider "the significance of a purported termination" of the collective bargaining agreement in a § 515 action, provided the inquiry is "superficial").

A–H's termination-of-the-contract contention fits comfortably within these exceptions to the general rule against asserting contract defenses in an ERISA § 515 action. Instead of a precluded contract "defense," A–H's termination argument goes to the question whether a contractual promise to contribute exists in the first instance. *See Laborers Health & Welfare Trust Fund v. Fisher Dev., Inc.,* No. 94–15596, 1996 WL 146689, at *5 (9th Cir. Apr.1, 1996) ("[T]he fact that there may not be any contract at all to obligate an employer to pay is a different thing altogether."). Section 515 after all was designed only to preclude "complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions." *Gerber Truck,* 870 F.2d at 1153 (quotation omitted) (emphasis added). A–H's claim that it terminated the relevant agreement obligations is hardly "unrelated" to its alleged promise to make contributions on behalf of its employees.

In response to this conclusion, the Funds argue that we should follow *Carpenters Health & Welfare Trust Fund v. Bla–Delco Constr., Inc.,* 8 F.3d 1365, 1369 (9th Cir.1993), which held that a party's "purported termination of the [collective bargaining agreement] is not a legitimate defense to the Trust Funds' action." Given the brevity of the *Bla–Delco* analysis, the breadth of its holding does not command an obvious answer. Does the decision apply to any termination dispute? Or does it apply only to termination disputes that would mire employee benefit funds in lengthy collateral disputes between the union and the employer? Later Ninth Circuit cases have given the decision a narrow

reading. *See Laborers Health & Welfare Trust Fund v. Delbon Co.,* 199 F.3d 1109, 1110–11 (9th Cir.2000) (distinguishing *Bla–Delco* on the grounds that it involved a live dispute over termination, whereas the union in the instant case had not challenged the purported termination that occurred over 12 years earlier); *Fisher Dev.,* 1996 WL 146689, at *4–5. And the Fifth Circuit sensibly has concluded that *Bla–Delco* does not make sense as applied to termination disputes that require only a cursory review of the parties' actions. *See Alfred Miller Gen. Masonry,* 157 F.3d at 409 n. 12 (noting that a court may consider a purported termination provided that its inquiry into the effectiveness of the termination is merely "superficial"). The inability to consider a compelling termination defense, the Fifth Circuit concluded, would eviscerate the requirement that a contractual obligation exist in the first instance. *Id.* In our view, the Fifth Circuit's decision sensibly balances the competing interests in avoiding complex litigation that starves a fund's necessary contributions and ensuring that the employer has a legitimate contractual obligation to make employee contributions. As A–H's termination defense represents a classically straightforward inquiry into whether the contract still existed, the district court permissibly considered the defense.

### III.

For the foregoing reasons, we affirm.