RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RAYMOND ORRAND, Administrator of the Ohio Operating Engineers Health & Welfare Plan, Ohio Operating Engineers Pension Fund, Ohio Operating Engineers Apprenticeship Fund, Ohio Operating Engineers Education & Safety Fund; TRUSTEES OF THE OHIO OPERATING ENGINEERS HEALTH & WELFARE PLAN, OHIO OPERATING ENGINEERS PENSION FUND, OHIO OPERATING ENGINEERS APPRENTICESHIP FUND, OHIO OPERATING ENGINEERS EDUCATION & SAFETY FUND,

*Plaintiffs-Appellees,*

*v.*

SCASSA ASPHALT, INC.,

*Defendant-Appellant.*

No. 14-3954

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-01131—Edmund A. Sargus, Jr., Chief District Judge.

Argued: April 22, 2015

Decided and Filed: July 21, 2015

Before: SILER, MOORE, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Faith R. Dylewski, LAW OFFICES OF ROBERT E. SOLES, JR. CO., LPA, North Canton, Ohio, for Appellant. Daniel J. Clark, VORYS, SATER, SEYMOUR AND PEASE, LLP, Columbus, Ohio, for Appellees. **ON BRIEF:** Robert E. Soles, Jr., LAW OFFICES OF ROBERT E. SOLES, JR. CO., LPA, North Canton, Ohio, for Appellant. Daniel J. Clark, James W. Pauley III, VORYS, SATER, SEYMOUR AND PEASE, LLP, Columbus, Ohio, for Appellees.

1

—————————

**OPINION**

—————————

JANE B. STRANCH, Circuit Judge.  Raymond Orrand, Administrator, and the Trustees of the Ohio Operating Engineers Health & Welfare Plan, Pension Fund, Apprenticeship Fund, and Education & Safety Fund ("the Funds"), filed suit against Scassa Asphalt, Inc., to collect delinquent fringe benefit contributions owed to the Funds.  The Funds are jointly-administered, multi-employer fringe benefit programs established for the benefit of employees of construction contractors who perform work under a collective bargaining agreement (CBA) known as the Ohio Highway Heavy Agreement between the International Union of Operating Engineers, Local 18 and Its Branches, AFL-CIO (the Union) and the Labor Relations Division of the Ohio Contractors Association.  The Funds are third-party beneficiaries of the CBA.

The district court granted summary judgment in favor of the Funds, requiring Scassa Asphalt to pay $141,356.18 in delinquent benefit contributions plus interest, statutory interest, and costs.  For the reasons explained below, we AFFIRM.

**I. BACKGROUND**

Scassa Asphalt is an Ohio company engaged in performing asphalt work primarily for small municipalities.  Nicholas "Nick" Scassa, the company's President, and his brother, Ettore Scassa, handled most of the work with the help of a few laborers.

Scassa Asphalt alleges that, in February 2009, it experienced work interference from the local laborers' union.  Mike Kramer, who served as the local representative for Operating Engineers Local 18, approached Nick Scassa and represented to him that, if Scassa Asphalt joined Local 18, the company would no longer experience problems with the laborers' union.

On February 6, 2009, Nick Scassa, on behalf of Scassa Asphalt, executed a one-page document entitled, "AGREEMENT Highway Heavy Construction" (hereafter "short-form Agreement"). R. 23-3, Page ID 94.  In the short-form Agreement, Scassa Asphalt affirmed that it was "not a member of any multi-employer bargaining group [that] has a labor agreement with the Union," and that it "recognize[d] the Union as the exclusive bargaining agent of all its

employees engaged to work within the trade jurisdiction of the Operating Engineers in Highway Heavy Construction for the Company." *Id.* The short-form Agreement further provided that Scassa Asphalt "is not represented by any employer bargaining unit nor has any employer bargaining unit authority to act as an agent for the Company; however, the Company agrees to adopt and accept all the terms, wage rates and conditions of the 2007–2010 Ohio Highway Heavy Agreement . . ., except as modified herein." *Id.* Scassa Asphalt "further agree[d] to make contributions to the Health and Welfare Fund, Pension Fund, Apprenticeship Fund and Safety Training and Educational Trust Fund as outlined in said Ohio Highway Heavy Agreement." *Id.* The short-form Agreement provided that "[a] copy of the 2007-2010 Ohio Highway Heavy Agreement is attached hereto and made a part hereof except as modified herein." *Id.* Scassa Asphalt "voluntarily recognize[d] the Union as the majority representative of its employees performing Operating Engineer work covered by the" Ohio Highway Heavy Agreement and agreed "that the Union has demonstrated that it is the majority representative of such employees in an appropriate collective bargaining unit." *Id.* The short-form Agreement was "effective as of the date set forth and shall remain in full force and effect unless modified by mutual agreement of the parties until expressly terminated by notice in writing from one party to the other party at least sixty (60) days prior to its anniversary date." *Id.*

As required by Article V, Paragraph 41 of the CBA, Scassa Asphalt obtained an insurance payment bond in the amount of $50,000 payable to the Ohio Operating Engineers Fringe Benefit Programs as a guarantee that the fringe benefit contributions would be paid in the event of Scassa Asphalt's delinquency. Nick Scassa attests that he retained copies of the short-form Agreement and the one-page insurance bond and understood these two pages "to be the whole of the Agreement between the parties." R. 34, Page ID 249. Scassa also attests that it was represented to him that the fringe benefits were for his personal benefit as the principal operating engineer of Scassa Asphalt. Accordingly, Scassa prepared a 2000 Hour Commitment Letter, which was dated February 7, 2009, but signed and notarized on February 13, 2009, committing Scassa Asphalt to contribute 2000 hours annually to fund health and welfare benefits and pension benefits "on behalf [of] the principal operating engineer." R. 34, Page ID 250, 254.

Scassa Asphalt alleges that in mid-February 2009, shortly after the documents were signed, members of the laborers' union appeared at Scassa Asphalt's job site in Massillon, Ohio and one member physically assaulted its subcontractor. Nick Scassa reported the incident to Mike Kramer of the Union and asked for assistance in dealing with the laborer's union. Scassa alleges that Kramer declined to intervene, so he told Kramer that Scassa Asphalt had no desire to remain in the Union and verbally terminated its relationship with the Union.

There were no further communications between Scassa Asphalt and the Union until February 15, 2010, when the Union notified the company by letter that the CBA would expire by its terms on April 30, 2010. The notice letter, signed by the Union's President, advised Scassa Asphalt of the Union's "desire to modify, amend, and/or negotiate a new agreement" and "to open negotiations for a new agreement covering wages, hours and conditions of employment." R. 34, Page ID 255. Although the letter requested an acknowledgement and response, Nick Scassa did not reply on behalf of Scassa Asphalt. Scassa states he believed that the Union had already canceled Scassa Asphalt's short-form Agreement after he informed Kramer verbally in mid-February 2009 that Scassa Asphalt was withdrawing from the Union. Scassa alleges that his company took no action in response to the Union's February 15, 2010 letter because the CBA was set to expire on April 30, 2010, and his company did not wish to negotiate a new contract with the Union.

Scassa Asphalt represents that its business slowed significantly by 2010, and by 2012 the company had ceased all operations and was insolvent. Other than the Union's February 15, 2010 notice letter, Scassa Asphalt did not receive any other communications until the Funds served the complaint and a request for audit in December 2012.

On October 24, 2013, the Funds performed an audit of Scassa Asphalt's payroll records for the period February 1, 2009 to October 1, 2013. During the audit period, Nick Scassa did not actually work 2000 or more hours per year. The audit findings included the unpaid hours actually worked by three operators who were employed by Scassa Asphalt, plus the 2000 hours per year that Scassa Asphalt was required to pay for Nick Scassa under the 2000 Hour Commitment Letter. The audit determined that there were 11,472.5 unpaid hours for all operators, including Nick Scassa, during the audit period, resulting in benefit contribution

delinquencies of $76,450.89 to the Health & Welfare Plan, $58,064.84 to the Pension Fund, $6,381.55 to the Apprenticeship Fund, and $458.90 to the Education & Safety Fund. The Funds sought a total of $141,356.18 in unpaid benefit contributions, accumulated interest of $61,061.08 calculated to November 15, 2013, plus $69.71 per day thereafter, additional statutory interest in a like amount, and costs.

The Funds' auditor subsequently prepared a separate assessment that included only the unpaid hours that all operators, including Nick Scassa, actually worked for Scassa Asphalt during the audit period. In this assessment, unpaid hours were included for the months of February through December 2009, February through May and July through December 2010, and January through May 2011. The total of 5,240 unpaid hours resulted in benefit contribution delinquencies of $34,744.41 to the Health & Welfare Plan, $23,968.01 to the Pension Fund, $2,750.81 to the Apprenticeship Fund, and $209.60 the Education & Safety Fund. The total amount owed under this assessment was $61,672.83 in delinquent contributions plus interest and costs.

To recover the unpaid contributions, Orrand and the Funds filed suit against Scassa Asphalt under the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132(a)(3) & 1145. The district court granted summary judgment in favor of Orrand and the Funds, enforcing both the short-form Agreement and the 2000 Hour Commitment Letter. The court awarded the Funds $141,356.18 in unpaid contributions for the period February 1, 2009 to October 1, 2013, under 29 U.S.C. § 1132(g)(2)(A); $61,061.08 in interest calculated to November 15, 2013, plus $69.71 per day thereafter, under 29 U.S.C. § 1132(g)(2)(B); $61,061.08 in statutory interest calculated to November 15, 2013, plus $69.71 per day thereafter, under 29 U.S.C. § 1132(g)(2)(C); and $350.00 in court costs under 29 U.S.C. § 1132(g)(2)(D). Scassa Asphalt filed a timely notice of appeal, conferring appellate jurisdiction on this court under 28 U.S.C. § 1291.

## II. STANDARDS OF REVIEW

A grant of summary judgment is reviewed *de novo*, and we will affirm the district court if the evidence, taken in the light most favorable to the non-moving party, demonstrates that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a

matter of law. *Cent. States, Se. & Sw. Areas Pension Fund v. Gen. Materials, Inc.*, 535 F.3d 506, 508 (6th Cir. 2008). The district court's interpretation of the contractual agreements between the parties is also reviewed *de novo*. *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 458 (6th Cir. 1989).

## III. ANALYSIS

Scassa Asphalt denies liability for any unpaid benefit contributions to the Funds, presenting four issues for our consideration. First, the company raises a termination defense against the Funds, arguing that the Union's February 15, 2010 letter notifying Scassa Asphalt of the CBA's April 30, 2010 expiration date effectively terminated the short-form Agreement binding Scassa Asphalt to the provisions of the CBA. Second, the company contends that the 2000 Hour Commitment Letter is unenforceable for lack of consideration but, even if it is enforceable, the letter contained no termination provisions, thereby permitting Nick Scassa to terminate the letter through verbal communication to Mike Kramer in mid-February 2009 that Scassa Asphalt withdrew from the Union. Third, the company argues that the public policy reasons for insulating employee fringe benefit contracts from standard contract defenses should not apply where a small family business executed the agreements to benefit only the company's principal. Finally, the company disputes the audit findings. It argues that the auditor, who assumed that the 2000 Hour Commitment Letter was in effect, improperly added fictitious unpaid hours to reach 2000 hours per year for Nick Scassa. The auditor then carried forward this fictitious calculation to October 1, 2013, after Scassa Asphalt had ceased operations in 2012. Each of these arguments will be addressed following a brief overview of the applicable law.

## A. Governing law under ERISA and the LMRA

We recently explained in *Operating Engineers Local 324 Health Care Plan v. G & W Construction Company*, 783 F.3d 1045, 1050-51 (6th Cir. 2015), that both ERISA and the LMRA require parties to enter into written agreements governing the creation and management of multi-employer fringe benefit funds. It is one of "ERISA's core functional requirements" that each "employee benefit plan shall be established and maintained *pursuant to a written instrument*." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (quoting 29 U.S.C. § 1102(a)(1)). Every employee benefit plan must "specify the basis on which payments are

made to and from the plan," 29 U.S.C.§ 1102(b)(4), and "[t]he plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with'" ERISA provisions. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) (quoting 29 U.S.C. § 1104(a)(1)(D)).

This "reliance on the face of written plan documents" serves the purpose of "enabling beneficiaries to learn their rights and obligations at any time." *Curtiss-Wright Corp.*, 514 U.S. at 83. It also lends certainty and predictability to employee benefit plans, serving the interests of both employers and their employees. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 402 (6th Cir. 1998) (*en banc*).

For benefit plans established through collective bargaining, the writing requirement is further reinforced by Section 302 of the LMRA, 29 U.S.C.§ 186(a), which bars an employer from contributing to benefit trusts designated by employee representatives unless the payments are "made in accordance with a written agreement with the employer." *Behnke, Inc.*, 883 F.2d at 459 (citing 29 U.S.C. § 186(c)(5)(B)). The general prohibition on contributing funds to employee representatives without written agreements seeks to prevent misappropriation and dissipation of monies that are owed to the employees. *Id.* "Collective bargaining agreements that establish ERISA plans are interpreted by use of ordinary contract principles to the extent those principles are not inconsistent with federal labor policy." *Operating Eng'rs Local 324 Health Care Plan*, 783 F.3d at 1051 (citing *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015)). Where a contract is in writing and its terms are clear and unambiguous, we ascertain the contract's meaning in accordance with the contract's plainly expressed intent. *Id.*

A third governing statute is § 515 of ERISA, which protects and streamlines the process for collecting delinquent contributions to ERISA plans from employers by limiting "unrelated" and "extraneous" defenses. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 88 & n.12 (1982). Section 515 provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Because "multiemployer plans are entitled to rely on the literal terms of written commitments between the plan, the employer, and the union, the actual intent of and understandings between the contracting parties are immaterial." *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998).

Congress adopted § 515 because "simple collection actions brought by plan trustees ha[d] been converted into lengthy, costly and complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions, and steps [were required] to simplify delinquency collection." *Kaiser Steel Corp.*, 455 U.S. at 87 (internal quotation marks omitted). The *en banc* Seventh Circuit articulated this congressional concern:

> [Multi-employer p]lans rely on documents to determine the income they can expect to receive, which governs their determination of levels of benefits. . . . Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize . . . . Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend. Litigation involving conversations between employers and local union officials— conversations to which plans are not privy—may be especially costly, and hold out especially great prospects of coming away empty-handed.

*Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (*en banc*). Thus, employers' written promises are enforceable if they are not inconsistent with law. *Id.* at 1153. "If the employer simply points to a defect in [contract] formation—such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law—it must still keep its promise to the pension plans. . . . Anything less may well saddle the plans with unfunded obligations." *Id.*

While § 515 arose from congressional concern about subjecting benefit funds to time-consuming and expensive litigation that is not related to the employers' promises to pay, the legislative sponsors of § 515 were particularly concerned about employer defenses based on alleged union conduct. As this court observed in *Behnke, Inc.*, Congress added § 515 to ERISA to "free[] pension and welfare funds from defenses that pertain to the unions' conduct," 883 F.2d at 460 (quoting *Robbins v. Lynch*, 836 F.2d 330, 333 (7th Cir. 1988)), and therefore "[a] claim

that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit." *Id.* (quoting *Robbins*, 836 F.2d at 334). There is a narrow exception to this rule for conduct that could support a claim for fraud in the execution of the contract because an employee benefit fund is not permitted to enforce a nonexistent contractual obligation. *Gerber Truck Serv., Inc.*, 870 F.2d at 1151. Fraud in the execution renders an agreement void *ab initio, Elec. Workers Local 58 Pension Trust Fund v. Gary's Elec. Serv. Co.*, 227 F.3d 646, 656–57 (6th Cir. 2000), and precludes the employee benefit fund from collecting. By contrast, fraud in the inducement makes a transaction merely voidable, *Sw. Adm'rs, Inc. v. Rozay's Transfer*, 791 F.2d 769, 774 (9th Cir. 1986), and "cannot cut off the fund's claims." *Behnke, Inc.*, 883 F.2d at 460. If no claim of fraud in the execution is raised, then the words, conduct, action, and inaction of the union are simply not relevant to a § 515 collection action that is based on the literal and unambiguous terms of an existing ERISA plan document or collective bargaining agreement. *New Bakery Co. of Ohio*, 133 F.3d at 959 (observing that the fund is entitled to enforce the writing without regard to the understandings or defenses of the original parties, similar to a holder in due course in commercial law).

These principles bring the merits of the legal issues presented in this appeal more sharply into focus. Before each issue is addressed, however, we note that Scassa Asphalt's appellate briefs refer repeatedly to "the Union" and do not draw the necessary distinction between the Union and the Funds. The CBA—the 2007-2010 Ohio Highway Heavy Agreement—was negotiated by the Union and the Labor Relations Division of the Ohio Contractors Association. By signing the short-form Agreement with the Union, Scassa Asphalt bound itself to abide by all of the provisions of the CBA, including the specific agreement to pay timely benefit contributions to the Funds, which stand as third-party beneficiaries under the CBA. *See Behnke, Inc.*, 883 F.2d at 460. As the governing law makes clear, the Funds are entitled to enforce the CBA and Scassa Asphalt's written short-form Agreement binding it to the CBA without having to defend against oral conversations that occurred between Nick Scassa and Mark Kramer of the Union. Because Congress chose to give the Funds "the upper hand" in § 515 collection litigation, *see Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v. A & H Mech. Contractors, Inc.*, 100 F. App'x 396, 401 (6th Cir. 2004), Scassa Asphalt seeks to avoid

liability for delinquency by arguing that it did not have an existing contract with the Union obligating it to make benefit contributions to the Funds.

## B. Scassa Asphalt's termination defense

The company contends that the Union's February 10, 2010 letter notifying it that the CBA was set to expire in April had the effect of terminating the short-form Agreement that bound the company to the requirements of the CBA. Because the short-form Agreement was terminated, the company argues, it had no obligation to pay benefit contributions and the Funds are barred from bringing this collection action.

Our unpublished cases have permitted a limited examination of certain termination defenses, "at least where it is evident upon 'a cursory review of the parties' actions' that the contract has been terminated." *Laborers Pension Trust Fund-Detroit & Vicinity v. Interior Exterior Specialists Constr. Grp., Inc.*, 394 F. App'x 285, 290 (6th Cir. 2010) (per curiam); *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund*, 100 F. App'x at 403. This position is consistent with published decisions in several other circuits permitting a termination defense. *See e.g., DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 653–54 (2d Cir. 1994); *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir. 1993); *Bakery & Confectionary Union & Industry Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1022 (4th Cir. 1997); *La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 409 n.12 (5th Cir. 1998). *But see Twin City Pipe Trades Serv. Ass'n, Inc. v. Frank O'Laughlin Plumbing & Heating Co.*, 759 F.3d 881, 885 (8th Cir. 2014) (avoiding recognition of a termination defense, but finding that facts would not support such a defense in any event). *Cf. Carpenters Health & Welfare Trust Fund v. Bla-Delco Constr., Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993) (holding that, because the CBA was not "void," but merely "voidable," the employer's purported termination of the CBA was not a legitimate defense to a trust fund collection action).

In both *Laborers Pension Trust Fund-Detroit* and *Plumbers & Pipefitters Local Union No. 572*, our court allowed employers to assert termination defenses, provided the inquiries were "superficial." 394 F. App'x at 290; 100 F. App'x at 403. This approach "sensibly balances the competing interests in avoiding complex litigation that starves a fund's necessary contributions

and ensuring that the employer has a legitimate contractual obligation to make employee contributions." *Plumbers & Pipefitters Local Union No. 572*, 100 F. App'x at 403. The limited inquiry must confirm that the employer unequivocally communicated its intent to withdraw from the CBA. *Laborers Pension Trust Fund-Detroit*, 394 F. App'x at 290. "A notice to terminate must be clear and explicit. . . . A notice of modification is not a notice of termination and does not affect termination of the contract." *Chattanooga Mailers' Union, Local No. 92 v. Chattanooga News-Free Press Co.*, 524 F.2d 1305, 1312 (6th Cir. 1975) (internal quotation marks omitted), *overruling on other grounds recognized by Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402, 404 (6th Cir. 1988). In addition, whether a contract continues in force during contract negotiations "depends on the consequence intended by the parties when they exchanged notices of their desire to amend the contract." *Id.* at 1311.

In this case, the district court reasoned that the Union's February 10, 2010 notice letter to Scassa Asphalt was a notice of contract modification, not a notice of termination, because the Union expressly stated its "desire to modify, amend, and/or negotiate a new agreement" and "to open negotiations for a new agreement covering wages, hours and conditions of employment." R. 36, Page ID 269. The language of the Union's letter also indicated a desire on the part of the Union to continue the relationship between the parties, not to terminate it. *Id.* at 270. Even construing all reasonable factual inferences in favor of Scassa Asphalt, the district court concluded that the February 10, 2010 letter "cannot be construed as a termination under the terms of the contract." *Id.* Moreover, even though the CBA was set to expire on April 30, 2010, "the short-form agreement that Scassa signed, by its very terms, never expires except upon written termination." *Id.* n.7.

In accordance with our precedent, the district court reasonably construed the February 10, 2010 letter as a request to modify the short-form Agreement and CBA and not as a request to terminate those agreements. Scassa Asphalt did not reply to the letter or at any other time provide clear and explicit written notice to the Union that Scassa Asphalt wished to withdraw from, and terminate, the short-form Agreement binding it to the CBA. Scassa Asphalt assumed that its short-form Agreement was terminated by Nick Scassa's verbal communication to Mike

Kramer in February 2009, and that the CBA expired by its terms, effective April 30, 2010. Neither of these assumptions was correct under the signed agreements or governing law.

As the district court accurately observed, moreover, both the short-form Agreement Scassa Asphalt signed and the CBA contained legally valid "evergreen" clauses. *See Trustees of the B.A.C. Local 32 Ins. Fund v. Fantin Enters., Inc.*, 163 F.3d 965, 968 (6th Cir. 1998). "When a contract is renewed via the operation of an evergreen clause, all of the attendant contractual obligations naturally continue for the period of renewal." *Id.* at 968–69. The short-form Agreement between Scassa Asphalt and the Union provided:

> This Agreement shall be effective as of the date set forth and shall remain in full force and effect unless modified by mutual agreement of the parties until expressly terminated by notice in writing from one party to the other party at least sixty (60) days prior to its anniversary date.

R. 23-3, Page ID 94. Article XI of the CBA read:

> THIS AGREEMENT shall be effective as of May 1, 2007 and shall continue in force and effect through April 30, 2010 and thereafter, from year to year until terminated at the option of either party, after sixty (60) days notice in writing to the other party.

R. 24-1 Page ID 151. Under these evergreen clauses, both contracts remained in force because neither the Union nor Scassa Asphalt gave timely written notice to the other party of an intent to terminate.

Scassa Asphalt cites three cases that do not advance its arguments. The company first relies on *Laborers Pension Trust Fund-Detroit*, where the employer clearly notified the union in writing that the contract between the employer and the union would not be renewed unless it was renegotiated to the employer's satisfaction. 394 F. App'x at 291. In that situation, this court held that the employer successfully terminated its obligations under the CBA. *Id.* at 292. By contrast, Scassa Asphalt did not send *any* writing to the Union expressing its intent to withdraw from or terminate the short-form Agreement binding it to the CBA.

The company's reliance on *Trustees of the B.A.C. Local 32 Ins. Fund v. Norwest Tile Co.*, No. 04-2436, 2005 WL 3440431 (6th Cir. Dec. 14, 2005), is similarly misplaced. In that case, the employer sent an unambiguous letter to the union withdrawing from the CBA and stating that

the employer would not be bound by a new agreement, although it desired to negotiate a new individual agreement with the union.  *Id.* at *4.  Scassa Asphalt did not submit any similar written withdrawal letter to the Union.

The company also relies on *Kaufman & Broad Home Sys., Inc. v. Int'l Bhd. of Firemen and Oilers, AFL-CIO*, 607 F.2d 1104, 1109 (5th Cir. 1979), which held that a duration clause in a CBA should be construed so that the union's notice to modify prevented automatic extension of the CBA.  That case was not a § 515 collection action, and the language of the CBA's duration clause was different from the wording of the duration clause in this CBA.  Because that case turned on interpretation of the specific contract language, it affords little assistance in this case.  Here, the district court reasonably construed the Union's February 10, 2010 letter as a notice to modify, which does not constitute notice of termination under our law.  *See Chattanooga Mailers' Union, Local No. 92*, 524 F.2d at 1312; *Int'l Union of Operating Eng'rs, Local No. 181 v. Dahlem Constr. Co.*, 193 F.2d 470, 475 (6th Cir. 1951).

Scassa Asphalt's remaining arguments regarding the termination defense are unavailing.  The company contends that "the Union" waited nearly four years to assert that the contracts remained in force and, during that four-year period, the company did not receive "from the Union" a request for payment of delinquent contributions or a request for audit.  We construe these arguments as directed to the Funds, not the Union, but we reiterate that the Funds may enforce the written agreements because they are not required to defend against conduct of the contracting parties that is extraneous to the terms of the written agreements.  *See Behnke, Inc.*, 883 F.2d at 459; *New Bakery Co. of Ohio*, 133 F.3d at 959.  Finally, Scassa Asphalt did not develop legal arguments in support of a laches defense against the Funds and will not be permitted to do so for the first time in this appeal.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552–54 (6th Cir. 2008).

## C.  The 2000 Hour Commitment Letter

Scassa Asphalt next argues that the 2000 Hour Commitment Letter promising to pay benefits for Nick Scassa as the principal operating engineer was executed several days after the short-form Agreement, and the letter lacked consideration.  The company contends that, because no contract was ever reached between the parties requiring Scassa Asphalt to contribute 2000

hours annually for Nick Scassa, it cannot be held liable for those hours. Furthermore, even if the 2000 Hour Commitment Letter formed a contract, the company argues, the letter did not include limitations or instructions governing the manner of termination. Therefore, in the absence of any termination provisions, Scassa Asphalt concludes that the verbal communication to Mike Kramer terminating the company's relationship with the Union in mid-February 2009 effectively rescinded and terminated the 2000 Hour Commitment Letter. The company also points out that the 2000 Hour Commitment Letter pertained only to Nick Scassa, no other employees would have benefited from the letter, and there is no evidence that the Funds paid any pension or health and welfare benefits for Nick Scassa. As such, Scassa Asphalt contends that the Funds have suffered no damages.

We uphold the district court's ruling that ERISA § 515 preempts the contract defense of lack of consideration. *See Behnke, Inc.*, 883 F.2d at 460–61; *Gerber Truck Serv., Inc.*, 870 F.2d at 1154. The 2000 Hour Commitment Letter was executed in connection with the short-form Agreement and the CBA to which Scassa Asphalt agreed to be bound. Both the short-form Agreement and the CBA required Scassa Asphalt to give notice of termination in writing, which the company failed to do. Thus, the 2000 Hour Commitment Letter remained in force. Finally, the short-form Agreement required Scassa Asphalt to "make contributions . . . as outlined" in the CBA, R. 23-3, Page ID 94, and the CBA mandated payment of benefit contributions "for all hours paid to *each employee* by the Employer," R. 24-1, Page ID 143 (emphasis added). Even though Scassa Asphalt agreed to contribute 2000 hours annually for the principal operating engineer, the short-form Agreement and the CBA required benefit contributions on behalf of all employees of the company. Finally, the Funds must pay out benefits "even if the contributions they expected to receive do not materialize," *Gerber Truck Serv., Inc.*, 870 F.2d at 1151, so there is no merit to the argument that the Fund has suffered no damages as a result of Scassa Asphalt's failure to pay as promised.

## D. Public policy concerns

Scassa Asphalt next argues that the public policy reasons for insulating § 515 collection actions from standard contract defenses should not apply in the case of a small family business where the only benefits to be paid are for the principal of the company. Because this argument

was not raised below, we are not required to entertain it for the first time on appeal. *Scottsdale Ins. Co.*, 513 F.3d at 552. In any event, Scassa Asphalt is mistaken that only Nick Scassa, the principal operating engineer, stood to benefit from the contractual relationship with the Union. The CBA and the short-form Agreement required benefit contributions on behalf of all Scassa Asphalt employees. Moreover, the company has not pointed to any statute or case that carves out an exception relieving it from § 515 collection litigation. The size of the company is not relevant because the burdens on the Funds are the same. "Funds must assume that all participants in a plan are following the stated terms; no other approach permits accurate actuarial computations and proper decisions about which claims to pay." *Behnke, Inc.*, 883 F.2d at 460 (quoting *Robbins*, 836 F.2d at 333–34).

**E. Audit findings**

The final dispute about the audit findings largely turns on the second issue previously discussed: whether the 2000 Hour Commitment Letter is unenforceable due to lack of consideration. Scassa Asphalt posits that the 2000 Hour Commitment Letter is unenforceable; therefore, it can be held liable, at most, only for the hours Nick Scassa actually worked.

Because we uphold the district court's conclusion that the 2000 Hour Commitment Letter is enforceable, we necessarily affirm the court's decision to establish the amount of contributions owed by reference to the audit that included 2000 hours annually for Nick Scassa. Although Scassa Asphalt objects to the time period for which unpaid contributions have been calculated, the company did not provide written notice to the Union or the Funds at any time that the company intended to terminate the short-form Agreement binding it to the CBA. Under the valid evergreen clauses, the contracts remained in force. *See Trustees of the B.A.C. Local 32 Ins. Fund*, 163 F.3d at 968–69.

## IV. CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.